******************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.
******************************************

# STATE OF CONNECTICUT *v.* MICHAEL A. HEARL
## (AC 39463)

Sheldon, Keller and Eveleigh, Js.

*Syllabus*

The defendant, who had been convicted of nineteen counts of the crime of cruelty to animals in violation of statute (§ 53-247 [a]), appealed to this court. The defendant had moved his goat cheese manufacturing business to a farm, where he leased one half of a barn to house his herd of goats. Wind, rain and snow could enter the barn because it did not have fully enclosed walls. The defendant hired workers to care for the herd and initially visited the farm frequently, but his visits became less frequent with time. The state Department of Agriculture began an investigation after it became aware of concerns about the health of the goats. A department inspector observed, inter alia, manure in the barn, inadequate bedding, hay that was soiled and wet, and a feeding rack that was not filled with hay. The goats exhibited signs of cold stress and were shivering and coughing, and pregnant does were not receiving proper care. In derogation of common herd management practices, the goats were not separated by age, breed, milking status or pregnancy status, but instead roamed the barn as one unsorted unit. The department inspector also observed dead goats piled in a manger where young goats would play on top of the carcasses, thereby exposing them to infectious materials. A department veterinarian also observed multiple emaciated goats, and saw that the goats were not receiving adequate nutrition and sporadically received water. The herd also was riddled with internal parasites, and goat carcasses were strewn throughout the barn. The defendant thereafter contacted a private veterinarian, K, and asked her to euthanize a goat in order to perform a necropsy and determine what the goats were suffering from. K performed necropsies on two goats and determined, inter alia, that they were suffering from muscle wasting, serious atrophy of fat and loss of fat stores, and that certain presumed neurological signs were the result of weakness related to their poor nutritional state. K instructed the defendant about feeding the goats and told him that heat lamps needed to be installed in the barn. The department inspector thereafter returned to the farm and observed that no changes had been made since her last visit. Heat lamps that were then in the barn were not being used. Goats were huddled together for warmth, two abandoned newborn kids were wet and in unsanitary conditions, and another baby goat had been trampled to death. The department inspector visited the farm again the next day and observed that two heat lamps had been installed for the entire herd. The heat lamps were inadequate to provide warmth for all the goats. The department's recommendation to provide shelter from the wind also had not been heeded, it did not appear that the goats had been fed and the overall condition of the herd continued to decline. The department thereafter seized the surviving goats, two of which later died. *Held*:

1. The evidence was sufficient to support the defendant's conviction of cruelty to animals, as the jury reasonably could have concluded that the defendant confined or had charge or custody of the goats, and failed to give them proper care or food, water and shelter: there was ample evidence to support a finding that the defendant confined or had charge or custody of the goats, as the defendant negotiated the lease for the barn and held himself out as the owner and caretaker of the goats, he frequently cared for the goats when he first brought them to the barn, he purchased hay and arranged for and paid K, a veterinarian, to euthanize certain goats, and the defendant had an extensive conversation with K about what was necessary to feed the herd and keep the kids warm; moreover, the defendant was the only person who asked the department about how to dispose of dead goats in the barn, there was no evidence that he ever advised the department to discuss the care of the goats with someone other than himself, and there was ample evidence to support the inference that the goats did not receive proper care or, alternatively, that they did not receive adequate food, water and shelter,

as the goats were starving, riddled with parasites and diseases when they were confiscated, and they were not properly sorted while housed in the barn, where conditions were unsanitary and inadequate to provide them shelter from the elements.

2. The defendant could not prevail on his claim that the trial court improperly declined to instruct the jury on criminal negligence; our Supreme Court has recently determined that general intent, rather than criminal negligence, is the appropriate mens rea for the "unjustifiably injures" clause of § 53-247 (a), and the defendant conceded that the legislature did not include specific intent provisions in the relevant portion of § 53-247 (a).

3. The defendant could not prevail on his unpreserved claim that § 53-247 (a) is unconstitutionally vague as applied to his conduct, which was based on his assertion that the terms "charge" and "custody" in § 53-247 (a) did not provide notice that he bore the responsibility of caring for the goats and, therefore, what proper care was required of him; given that the plain meaning of the relevant portion of § 53-247 (a) is that a person who bears the responsibility of care for an animal must give that animal proper care, the record contained ample evidence that a reasonable person in the defendant's position would know that he bore the responsibility of caring for the goats and, thus, could face criminal liability for failing to do so, the terms "charge" and "custody" limit criminal liability to those who have the responsibility to care for an animal, and the defendant's vagueness challenge was further undermined by the evidence that he had notice that his conduct violated the law, as representatives from the department informed him prior to the time of his arrest that his treatment of the goats violated the animal cruelty statute.

4. The defendant could not prevail on his unpreserved claim that his conviction of nineteen charges of animal cruelty violated the prohibition against double jeopardy because the phrase "any animal" in § 53-247 (a) refers to a species of animal, rather than to an individual animal; the phrase "any animal" was not ambiguous, as the plain meaning of the singular word "animal" is that § 53-247 (a) was intended to create a per animal unit of prosecution, the legislature decided to use the singular "animal," rather than the plural "animals," and did not use the term "species" or the phrase "class of animal," and, therefore, although the defendant's conduct in mistreating the animals occurred over the same period of time and consisted of the same general acts, because each of the charged offenses pertained to a different, identifiable goat, the defendant's abuse and maltreatment of each goat constituted a separate crime.

Argued December 7, 2017—officially released May 29, 2018

*Procedural History*

Substitute information charging the defendant with nineteen counts of the crime of cruelty to animals, brought to the Superior Court in the judicial district of Litchfield, geographical area number eighteen, and tried to the jury before *Matasavage, J.*; verdict and judgment of guilty, from which the defendant appealed to this court. *Affirmed.*

*Jon L. Schoenhorn*, with whom, on the brief, was *Ariel R. MacPherson*, for the appellant (defendant).

*Gregory L. Borrelli*, deputy assistant state's attorney, with whom, on the brief, were *David S. Shepack*, state's attorney, and *Devin T. Stilson*, supervisory assistant state's attorney, for the appellee (state).

*Opinion*

KELLER, J. The defendant, Michael A. Hearl, appeals from the judgment of conviction, rendered following a jury trial, on nineteen counts of animal cruelty in violation of General Statutes § 53-247 (a).[1] The defendant claims that (1) the evidence adduced at trial was insufficient to sustain his conviction, (2) the trial court did not provide the jury with a proper instruction on the required mental state to prove a violation of § 53-247 (a), (3) § 53-247 (a) is unconstitutionally vague as applied to his conduct, and (4) his conviction and sentencing on nineteen separate counts of animal cruelty violates the constitutional prohibitions against double jeopardy. We affirm the judgment of the trial court.

On the basis of the evidence presented at trial, the jury reasonably could have found the following facts. In the fall of 2013, the defendant and Tara Bryson, his business partner, moved their goat cheese manufacturing business, Butterfield Farm (business), to Hautboy Hill Farm (farm) in the town of Cornwall. In May, 2014, the defendant and Bryson relocated a herd of goats to the farm from Massachusetts. The defendant and Bryson negotiated an oral lease with Allyn H. Hurlburt III, the owner of the farm, to house the goats in Hurlburt's barn. Hurlburt made it clear that the lease covered only the rental of the barn space and was not a boarding lease. In a boarding lease, the lessor agrees to provide care for the animals in addition to the space to house them. The barn the defendant moved the goats into was an open style barn, which means that it did not have fully enclosed walls. As the farm was located on an exposed hill with little topographical protection from the elements, cold winds would gust through the open walls of the barn. Previously, Hurlburt used the barn to house 100 dairy cattle. Hurlburt had remodeled the barn such that it had a ridge vent in the roof. This modification of the barn was suitable for dairy cattle, which produce a great deal of heat. This modification, however, was not suitable for goats, and it permitted rain and snow to enter the barn.

Donald Betti rented the other half of the barn in order to store his prized dairy cattle, and he had the opportunity to observe the goats frequently. During the summer of 2014, the defendant visited the farm frequently. The defendant's visits, however, became less and less frequent with time. The defendant and Bryson hired Kim Lamarre and Kyle Brimmer to care for the herd. Betti, through his observations of the herd, became increasingly concerned about the health of the goats. In July, 2014, Betti alerted Chris Stroker, a state milk inspector, to his concerns about the health of the goats. On September 17, 2014, the state Department of Agriculture (department) suspended the business' permit to produce milk in order to make cheese and instructed that produced milk be given to the kid goats.

Betti's concerns were not alleviated, and in October, 2014, he e-mailed Elizabeth Hall, an agriculture and marketing inspector for the department, about the health of the goats. In particular, he was concerned about the presence of sore mouth, a type of fungal infection, in some of the baby goats. Betti observed that the condition of the goats continued to deteriorate during the fall. The goats appeared emaciated and mortality rates increased. Betti observed that the goats had a sickly appearance and that there was a high mortality rate, especially among the babies, but he observed that the goats did not appear to be under the care of a veterinarian.

On December 22, 2014, an animal control officer visited the farm and filed a complaint with the department. In response, the department began an investigation into the conditions on the farm and, on December 23, issued a quarantine order due to the morbidity and mortality rates among the herd. At the time of issuing the quarantine order, the department was unsure if the condition of the goats was attributable to disease or poor herd management.

Hall became involved with the investigation of the defendant's goats in December, 2014. On December 23, 2014, Hall made her first visit to the farm. She observed an accumulation of manure throughout the "cold, open barn," and inadequate bedding. There was a small amount of low quality[2] hay available for food. Hall described one goat as "depressed. She had her head down. She wasn't acting as inquisitive as most troublemaking goats are. She was very dull and lifeless." In addition, the goats were exhibiting signs of cold stress and shivering on a relatively mild 38 degree day. The feeding rack was not filled with hay. In derogation of common herd management practices, the goats were not separated by age, breed, milking status, or pregnancy status; instead, the goats roamed the barn as one unsorted unit.

On December 26, 2014, Hall returned to the farm to assess if there were any changes with respect to feeding or the conditions generally. She observed a downed[3] buck named Grover Cleveland in the center alley of the barn. In the three days since Hall's prior visit, Grover Cleveland had moved only a couple of feet by wriggling around on the ground; he was covered in his own urine and his fur had been worn away from paddling like a dog in an attempt to pull himself onto his chest. The hay in the barn remained soiled and wet. The feeding rack was not filled with hay.

On December 26, 2014, Dr. Bruce Sherman, a veterinarian with the department, joined Hall at the defendant's farm. Sherman observed multiple downed and emaciated goats. For example, Sherman saw a downed, white saanen[4] doe that "had a poor body condition . . . ." This goat was emaciated, as indicated by its

prominent vertebral processes and visible ribs. Sherman further observed that, "[t]he doe had been [downed] for quite a period of time. . . . [I]t had been . . . paddling, [which means that it had been] laying on its side moving its legs and in doing so moved . . . away what little hay and bedding that was there. There was a pile of fecal material behind it, indicating that the goat hadn't received any palliative care or nursing care to move it or try to get it up. . . . [T]he head of this animal had been moving back and forth and moving the hay away, and sort of digging into the soil underneath it."

Sherman further observed that conditions on the farm were inadequate. The goats were not receiving adequate nutrition and sporadically received water. Does did not have enough energy during the last trimester of pregnancy and, as a result, gave birth to underweight kids with low survival rates. Many of the goats were too weak to get up, and the barn did not provide adequate shelter from the weather. The goats were not separated into groups, a necessity for proper herd management. This allowed the remaining vigorous bucks to push out the smaller and weaker goats on the occasions when food was available. The barn also lacked a creep feeder, which is designed for adolescent goats to have a free choice of nutrients and to keep the adults out. Moreover, the herd was riddled with internal parasites and there were carcasses strewn throughout the barn.

On December 28, 2014, Hall observed that conditions in the barn had not changed. The goats were not doing well and were not receiving adequate food or water. Hall noticed that more goats were coughing and exhibiting signs of cold stress. She also discovered more mortalities and that Grover Cleveland had not changed his location since her last visit. Dead goats were piled in a manger near where the hay was stored. The young goats had access to this area and would "play . . . on top of [the carcasses]," exposing them to infectious materials. The feeding rack remained empty. Hall also noticed that there was a pregnant doe that was not receiving proper care. Sound farming practices dictate that expecting does be kept in a sanitized, dry area and that there should be a heat lamp for the newborns. The defendant was not providing these conditions at the farm.

On December 29, 2014, three members of the department—Hall, Sherman, and Wayne Kasacek—had a conference call with the defendant and Bryson. The members of the department implored the defendant to take corrective actions in order to improve the conditions of the goats. Specifically, they recommended that a veterinarian assess the entire herd and provide feeding instructions. The defendant told the department that the goats had a condition known as meningeal worm. Sherman told the defendant that meningeal worm

would not account for the morbidity and the mortality rates in the herd. In response, the defendant became combative and stated that he knew that the goats had meningeal worm because he "talked to a lot of farmers and had done research himself . . . ."

On December 29, 2014, after speaking with representatives of the department, the defendant contacted a veterinarian, Dr. Katherine Kane. The defendant requested that Kane euthanize a goat in order to perform a necropsy. On December 30, Kane arrived to euthanize one animal.[5] Kane did not intend to remain at the farm for a long period of time, but she did so because the defendant was present and asked her many questions. The defendant informed her that the goats were suffering from meningeal worm[6] and that he had been treating them with fenbendazole. Kane, skeptical that the goats were suffering from meningeal worm, informed the defendant that meningeal worm could only be diagnosed with a necropsy, and that he and Bryson should not be "pouring more medication down all these animals." Kane also recommended that a second, healthier goat that the defendant and Bryson did not administer medicine to also be euthanized so that a necropsy could be performed on it. Ultimately, Kane euthanized Grover Cleveland and a doe. The preliminary results of the necropsy performed on Grover Cleveland revealed "muscle wasting, serious atrophy of fat and loss of fat stores . . . . It is likely . . . the presumed neurologic signs were the result of weakness related to a poor nutritional state." The final diagnosis, dated January 16, 2015, identified Grover Cleveland's ailments as coccidiosis,[7] nematodiasis,[8] emaciation (muscle wasting and serious atrophy of fat),[9] and splenic extramedullary hematopoiesis.[10] Meningeal worm was not found during the necropsy. On the basis of the preliminary results of the necropsies, Kane instructed the defendant how much the goats should be fed and that heat lamps needed to be installed.

On January 7, 2015, Hall returned to the farm. Hall observed that, despite the discussions that had occurred between the defendant and the department concerning the condition of the goats, no changes had been made since her last visit. It was a cold day and the goats were huddled together for warmth in a pen with a fiberglass calf hutch because the barn did not have adequate bedding. By huddling together, the goats' respiration increased the humidity in this small hutch. The increased humidity caused their hair to become even more matted and made it more difficult for the goats to stay warm. There were heat lamps in the barn, but they were not being used, despite the department's recommendation to do so. There were two abandoned newborn kids that were still wet and in very unsanitary conditions. Another baby had been trampled to death.

Hall returned to the farm on January 8, 2015. At this

point, two heat lamps had been installed for the entire herd. The heat lamps were woefully inadequate to provide warmth for all the goats, and does were fighting with each other to get into one of the warm areas. The department's recommendation to provide shelter from the wind had not been heeded. The overall condition of the herd continued to decline, and it did not appear that the goats had been fed. One doe had symptoms of cacheous lymphadenitis, which is a ruptured lymph gland. Despite the highly contagious nature of this disease, the affected doe remained with the rest of the herd. The goats also did not have access to drinking water. The tub, which provided them access to fresh water, had frozen because the water heater in the tub was either broken or turned off.

Hall visited the farm again on January 9, 2015, but found no improvement in the goats' care. Hall made her final three visits to the farm on January 11, 2015. On this day, Hall arrived just before 7 a.m. and stayed until 9:30 a.m. She saw Betti arrive to care for his cows and told him to call her if anyone came to attend to the goats. Hall returned at 4 p.m. and saw the defendant and Bryson arrive with a bale of hay. Fifteen minutes after arriving, the defendant and Bryson left the farm in the company van without caring for the goats. Hall came back to the farm for a third time that day at 5:45 p.m. to see if anyone had attended to the goats. Hall discovered that nothing had been done to care for the herd that day and became distraught. She began to give the goats hay and water with the help of Betti. The goats that were able to stand approached Hall anxiously as she fed them and were fighting amongst themselves for water. As Hall left the farm at 7:30 p.m., Brimmer arrived.

The department seized the seventy-four surviving goats on January 16, 2015. Dr. Mary Jane Lis, a veterinarian with the department, assessed each goat and assigned each one a body score. The body score is a visual score on a scale of one to five that assesses the health of an individual goat—a goat that receives a score of one is very thin and emaciated, and a score of five would be assigned to an obese goat. The average score of the herd was two and one-half[11] and Lis assigned nineteen goats a score of one.[12]

Two of the goats that received a score of one died within one week of the department seizing the herd. Necropsies were performed on these two goats, a male saanen and a female nubian.[13] The causes of death for the male saanen included chronic suppurative bronchopneumonia and pleuritis,[14] chronic lymphoplasmacytic tracheitis,[15] pulmonary nematodiasis, and emaciation. The female nubian died from interstitial neutrophilic and lymphocytic histiocytic pneumonia, pulmonary nematodiasis, centrilobular hepatocellular atrophy,[16] and serous atrophy of fat, which is an indication of

chronic malnutrition or starvation.

Lis tested the seventeen surviving seized goats with body scores of one for caprine arthritis encephalitis, caseous lymphadenitis, and Johne's disease. Caprine arthritis encephalitis is a preventable virus that impacts the longevity of a goat. It causes arthritis and decreases the production of milk. Only one of the seventeen goats tested negative for this disease. Caseous lymphadenitis is bacterial disease that causes boils or abscesses. Fourteen of the seized goats tested positive for this disease. Johne's disease is a bacterial disease that renders a goat unable to absorb nutrients. Three of the seventeen goats tested positive for this disease.

The seventeen confiscated goats that received body scores of one were all extremely emaciated when the department took possession of them. One goat was described as a "walking frame . . . of bones," and many of the others were so thin that Lis could feel every one of their vertebrae when palpating them and their entire rib cages were visible. Their hooves were overgrown, which made walking difficult and painful. They each suffered from a variety of ailments and conditions, which included abscesses, lice, dermatitis, missing hair, difficulty breathing, and swelling and edema in both ears. Some goats had necrosis in the ear margins as a result of untreated ear infections. One goat, named Sasquatch, had been improperly dehorned.

By May, 2015, the condition of the confiscated goats had improved dramatically under the department's care. A weigh-in on May 20, 2015, revealed that the seventeen goats gained an average of 19.2 pounds.[17] They appeared to have a "sassy" demeanor, and their overall appearance had improved. Additional facts will be set forth as necessary.

I

First, the defendant claims that the evidence adduced at trial was insufficient to sustain his conviction of animal cruelty. We disagree.

"The standard of review we apply to a claim of insufficient evidence is well established. In reviewing the sufficiency of the evidence to support a criminal conviction we apply a [two part] test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [jury] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . .

"We note that the jury must find every element proven beyond a reasonable doubt in order to find the defendant guilty of the charged offense, [but] each of the basic and inferred facts underlying those conclusions need not be proved beyond a reasonable doubt. . . . If it is reasonable and logical for the jury to conclude

that a basic fact or an inferred fact is true, the jury is permitted to consider the fact proven and may consider it in combination with other proven facts in determining whether the cumulative effect of all the evidence proves the defendant guilty of all the elements of the crime charged beyond a reasonable doubt. . . .

"Moreover, it does not diminish the probative force of the evidence that it consists, in whole or in part, of evidence that is circumstantial rather than direct. . . . It is not one fact, but the cumulative impact of a multitude of facts which establishes guilt in a case involving substantial circumstantial evidence. . . . In evaluating evidence, the [jury] is not required to accept as dispositive those inferences that are consistent with the defendant's innocence. . . . The [jury] may draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical. . . .

"Ordinarily, intent can only be inferred by circumstantial evidence; it may be and usually is inferred from the defendant's conduct. . . . Finally, [a]s we have often noted, proof beyond a reasonable doubt does not mean proof beyond all possible doubt . . . nor does proof beyond a reasonable doubt require acceptance of every hypothesis of innocence posed by the defendant that, had it been found credible by the [jury], would have resulted in an acquittal. . . . On appeal, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the [jury's] verdict of guilty." (Citations omitted; internal quotation marks omitted.) *State* v. *Campbell*, 328 Conn. 444, 503–505,     A.3d     (2018).

Section 53-247 (a) provides in relevant part: "Any person who . . . having impounded or *confined any animal*, fails to give such animal proper care . . . or, *having charge or custody of any animal* . . . fails to provide it with proper food, drink or protection from the weather . . . shall, for a first offense, be fined not more than one thousand dollars or imprisoned not more than one year or both . . . ." (Emphasis added.)

Thus, to obtain a conviction in the present case, the state bore the burden of proving beyond a reasonable doubt that the defendant confined the goats and failed to give them proper care or that the defendant had charge or custody of the goats and failed to provide proper food, drink, or protection from the weather. See General Statutes § 53-247 (a). The defendant does not argue that the evidence was insufficient to establish either that the goats did not receive proper care or that the goats were not given adequate food, water, and shelter. Instead, he argues that the evidence was insufficient to prove that *he* confined, or had charge or custody of, the goats. As Connecticut case law has not addressed what constitutes "confinement" or "charge or custody"

for the purpose of supporting a conviction for a violation of § 53-247 (a), the sufficiency issue presents a preliminary issue of statutory interpretation.

"The process of statutory interpretation involves the determination of the meaning of the statutory language as applied to the facts of the case . . . . When construing a statute, [o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . In other words, we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of [the] case . . . . In seeking to determine that meaning . . . [General Statutes] § 1-2z directs us first to consider the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered." (Footnote omitted; internal quotation marks omitted.) *State* v. *Leak*, 297 Conn. 524, 532–33, 998 A.2d 1182 (2010). "Issues of statutory construction raise questions of law, over which we exercise plenary review." (Internal quotation marks omitted.) *State* v. *Fernando A.*, 294 Conn. 1, 13, 981 A.2d 427 (2009).

We begin our plain meaning analysis of the statute by noting that the legislature did not define the terms "charge," "custody," or "confinement." Thus, we turn to the dictionary entries for common definitions of these terms. The term "charge" is defined as "a duty or responsibility laid upon or entrusted to one" or "anything or anybody committed to one's care or management." Random House Webster's Unabridged Dictionary (2d Ed. 2001). The term "custody" is defined as "keeping; guardianship; care." Id. An individual with charge or custody of an animal must give that animal adequate food, water, and shelter from the elements. On the basis of the foregoing definitions, in the context of the statute, the terms "charge" and "custody" must necessarily describe when an individual has a duty to provide care for an animal. Thus, this clause of § 53-247 (a) punishes individuals who, having the responsibility to care for an animal, fail to do so. Last, "confined" is defined as "limited or restricted." Id. Affording the animal cruelty statute its plain meaning, we conclude that it applies when someone limits an animal's ability to roam. By keeping an animal in a set location, responsibility then attaches to provide adequate care for that animal.

The trial court instructed the jury in a manner consistent with our interpretation of § 53-247 (a). The court gave helpful examples[18] of what the terms "confined," "charge," and "custody"[19] mean in the context of the statute. The court instructed the jury as follows: "The state must prove that [the defendant] first, confined the particular goat at issue, and, second, failed to give that particular goat proper care. . . .

"Confined means to hold within a location or to keep within limits. Proper care means that degree of care that a person of ordinary intelligence would provide to an animal to maintain its well-being under any reasonable standard. . . .

"Under the second claim, the state must prove the following elements beyond a reasonable doubt. The state must prove that [the defendant], first, had charge or custody of a particular goat at issue, and, second, failed to give that goat proper food, drink, or protection from the weather. . . .

"Charge means to have an obligation or duty or to be entrusted with the care, custody, or management of something. Custody means immediate charge and control exercised by a person or authority. Proper means that which is fit, suitable, adapted, or correct."

Resolving the defendant's sufficiency claim requires us to determine whether the evidence, construed in the light most favorable to sustaining the verdict, supports a reasonable inference that the defendant bore responsibility for caring for the goats or kept the goats within the confines of the barn.

We begin our assessment of the evidence by observing that there was ample evidence to support an inference that the goats did not receive proper care or, alternatively, that they did not receive adequate food, water, and shelter. The defendant does not appear to dispute this obvious fact. When the goats were confiscated, they were starving and riddled with parasites and diseases. The department's investigation revealed that conditions in the barn were wholly inadequate to provide them shelter from the elements and were unsanitary. Inside the barn, the goats were not properly sorted. Moreover, the evidence reveals that the goats did not receive adequate food or water.

There was ample evidence to support a finding that the defendant confined, or had charge or custody of, the goats. Hurlburt testified that the defendant brought the goats to the barn and that the defendant negotiated an oral lease for half the barn. Betti testified that he first met the defendant in the fall of 2013 when the defendant came to the farm to inspect the property in order to move his and Bryson's cheese-making business there. Betti testified that during the summer of 2014, after the defendant and Bryson brought the goats to the farm, the defendant arrived frequently to care for the goats, but the frequency of the defendant's visits decreased with time. Brimmer testified that the defendant came by occasionally to care for and feed the goats. Mark Ustico, a local part-time farmer, testified that the defendant contacted him to purchase hay because the defendant was "in a pinch."

There was evidence before the jury of the defendant's interactions with the department that supported the

finding that the defendant confined, or had charge or custody of, the goats. The department learned through its investigation of the herd that the defendant played an active role in the management of the goats. Lis testified that, during a conference call on December 23, 2016, with members of the department, the defendant "took the lead on telling me what was being done with the management of the goats" and that he "predominated the conversation" about the mortality rates in the herd. Sherman testified that on December 29, 2014, members of the department conducted another conference call with the defendant and Bryson concerning the recommendations made by the department. During the call, Sherman told the defendant that the condition of the herd remained "very poor" and that something needed to be done. The defendant responded by saying that the herd suffered from meningeal worm, and that he knew this because he had spoken with other famers and had prior experience with this parasite in a different herd in Massachusetts. Kasacek testified that during this phone call the defendant identified himself as the owner of the goats, told the department that the goats suffered from meningeal worm, and became combative when discussing the quarantine. By the end of the call, Kasacek believed that the department had convinced the defendant to do something about the goat's health because the defendant stated that he " 'had to get to work . . . .' " Sherman also testified that a third conference call involving the department, the defendant, and Bryson occurred on January 6, 2015. During this conversation, the department provided detailed instructions on how to care for the goats and stressed that the goats' nutrition was inadequate. Lis testified that Hall's observations at the farm were inconsistent with the representations made by the defendant on the conference call. Kasacek testified that the department, the defendant, and Bryson had a fourth conference call on January 7, 2015, because the department was concerned about the goats due to upcoming cold weather. Kasacek also testified that he had phone conversations with the defendant about what to do with dead goats in the barn and that when he called the defendant to inform about the seizure, the defendant asked, "what [is] to become of [my] goats . . . ?" During Hall's January 11, 2015 visit, she observed that the defendant arrived at the farm to deliver hay, but left the farm shortly after and did not provide the goats any care.

There was yet additional evidence of the defendant's interactions with Kane that supported the inference that the defendant was responsible for the herd. Kane testified that it was the defendant who contacted her on December 29, 2015, to request that a necropsy be performed. This was compelling evidence, for it would be reasonable to infer that the defendant would only have the authority to order the euthanization of the animals if he had charge and custody of them. Kane

met the defendant at the farm to inspect the goats on December 30, 2016. Kane testified that the defendant opened an account with her business in his name and used his credit card to pay her to euthanize two goats. Kane also recalled that the defendant and Bryson had been giving the goats fenbendazole without a diagnosis because the defendant believed the herd suffered from meningeal worm. On January 8, 2016, Kane told the defendant that the preliminary diagnosis from the necropsy "seemed to be emaciation . . . ." In addition to providing the defendant with the preliminary results, Kane and the defendant had an extensive conversation about what was necessary to feed the herd and keep the kids warm. Kane also testified that the defendant called her when the state confiscated the herd and said that the "state was seizing *his* animals . . . ." (Emphasis added.) There was no evidence that the defendant ever advised the department to discuss the care of the goats with someone other than himself.

In arguing that the evidence did not support a finding of confinement, or charge or custody, the defendant asserts that ownership is not the equivalent of confinement. This argument is not persuasive. Although ownership does not necessarily support a finding of confinement when the owner has hired someone else to care for an animal; *State* v. *Yorczyk*, 167 Conn. 434, 438–39, 356 A.2d 169 (1974); it can still be probative evidence that the defendant bore the responsibility of caring for the goats and authorizing their confinement. The defendant told members of the department that he was the owner of the goats and became involved in the department's investigation of the herd. During the investigation, the defendant gave the department the impression that he was there to care for "his" goats and that he would follow their instructions to improve herd management. Moreover, there was evidence that the defendant was not an absentee owner who left the goats in the hands of others. Cf. *State* v. *Yorczyk*, supra, 438–39. Instead, the evidence reflects that the defendant was both responsible for and in charge of the management of the goats. Brimmer, the hired help, testified about how the defendant sporadically came to the farm to tend to the goats and delivered hay to the farm.

The defendant asserts that it was Bryson alone who confined the goats.[20] First, we note that no authority limits liability under the statute to a single actor when the facts demonstrate that more than one person may have confined the goats or had charge or custody of them. Second, we observe that the evidence supported a reasonable inference that the defendant and Bryson jointly confined, or had charge or custody of, the goats. The defendant and Bryson both brought the goats to the farm and executed the oral lease for the barn space where the goats were confined. Additionally, they identified themselves as co-owners and participated in conference calls together with members of the department.

Third, there was evidence to support the inference that the defendant acted independently at times to represent himself as the person who was responsible for caring for the goats. The defendant communicated with members of the department without Bryson. The defendant also arranged for Kane to perform a necropsy, paid for her services, and contacted her about the results of the necropsies. He was also the only person who asked the department about how to dispose of the dead goats that were piled inside the barn.

We conclude our analysis by noting that we, as a reviewing court, must examine the evidence in its totality, viewed in the light most favorable to sustaining the jury's finding of guilt, to determine whether the jury reasonably could have determined that the state satisfied its burden of proof. The state, by presenting testimony of department members, Betti, Hurlburt, and Kane, introduced evidence to support the inference that the defendant held himself out as the owner and caretaker of the goats. Department members' descriptions of conditions in the barn and of the poor health of the goats supported the inference that the goats did not receive proper care. Thus, the jury reasonably could have concluded that the defendant, having confined, or having charge or custody of, the goats, failed to give the goats proper care or food, water, and shelter.

## II

Second, the defendant claims that the court should have instructed the jury on criminal negligence.

Our analysis begins with the standard of review. "When reviewing the challenged jury instruction . . . we must adhere to the well settled rule that a charge to the jury is to be considered in its entirety, read as a whole, and judged by its total effect rather than by its individual component parts. . . . [T]he test of a court's charge is not whether it is as accurate upon legal principles as the opinions of a court of last resort but whether it fairly presents the case to the jury in such a way that injustice is not done to either party under the established rules of law. . . . As long as [the instructions] are correct in law, adapted to the issues and sufficient for the guidance of the jury . . . we will not view the instructions as improper. . . .

"It is . . . constitutionally axiomatic that the jury be instructed on the essential elements of a crime charged. . . . The due process clause of the fourteenth amendment protects an accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged. . . . Consequently, the failure to instruct a jury on an element of a crime deprives a defendant of the right to have the jury told what crimes he is actually being tried for and what the essential elements of those crimes are. . . .

"[I]n reviewing a constitutional challenge to the trial court's instruction, we must consider the jury charge as a whole to determine whether it is reasonably possible that the instruction misled the jury. . . . The test is whether the charge as a whole presents the case to the jury so that no injustice will result. . . . We will reverse a conviction only if, in the context of the whole, there is a reasonable possibility that the jury was misled in reaching its verdict. . . . A jury instruction is constitutionally adequate if it provides the jurors with a clear understanding of the elements of the crime charged, and affords them proper guidance for their determination of whether those elements were present. . . . An instruction that fails to satisfy these requirements would violate the defendant's right to due process of law as guaranteed by the fourteenth amendment to the United States constitution and article first, § 8, of the Connecticut constitution. . . . The test of a charge is whether it is correct in law, adapted to the issues and sufficient for the guidance of the jury. . . . The primary purpose of the charge is to assist the jury in applying the law correctly to the facts which they might find to be established. . . . The purpose of a charge is to call the attention of the members of the jury, unfamiliar with legal distinctions, to whatever is necessary and proper to guide them to a right decision in a particular case." (Internal quotation marks omitted.) *State* v. *Johnson*, 165 Conn. App. 255, 287–89, 138 A.3d 1108, cert. denied, 322 Conn. 904, 138 A.3d 933 (2016).

The issue of the requisite mens rea applicable to the relevant portion of § 53-247 (a) is a question of statutory interpretation, which receives plenary review. See *State ex rel. Gregan* v. *Koczur*, 287 Conn. 145, 152, 947 A.2d 282 (2008).

"In determining [whether a crime] requires proof of a general intent [or] of a specific intent, the language chosen by the legislature in enacting a particular statute is significant. When the elements of a crime consist of a description of a particular act and a mental element not specific in nature, the only issue is whether the defendant intended to do the proscribed act. If he did so intend, he has the requisite general intent for culpability. When the elements of a crime include a defendant's intent to achieve some result additional to the act, the additional language distinguishes the crime from those of general intent and makes it one requiring a specific intent." (Internal quotation marks omitted.) *State* v. *Roy*, 173 Conn. 35, 45, 376 A.2d 391 (1977).

The following procedural history is relevant to this claim. The defendant preserved this claim by filing a request to charge on March 11, 2016. In this request to charge, the defendant submitted the following jury instruction on criminal negligence: "A person acts with criminal negligence with respect to a result or to a circumstance described by a statute defining an offense

when he fails to perceive a substantial and unjustifiable risk that such result will occur or that such circumstance exists. The risk must be of such nature and degree that the failure to perceive it constitutes a gross deviation from the standard of care that a reasonable person would observe in the situation." The state filed an objection, arguing that, the mens rea required for a conviction under § 53-247 (a) is general intent.

With respect to intent, the court instructed the jury in relevant part as follows: "Now, general intent is the intent to engage in conduct. Thus, it's not necessary for the state to prove that the defendant intended the precise harm or the precise result which eventuated. Rather, the state is required to prove that the defendant intentionally and not inadvertently or accidentally engaged in his actions. In other words, the state must prove that the defendant's actions were intentional, voluntary and knowing rather than unintentional . . . involuntary and unknowing.

"Now, what a person's intention was is usually a matter to be determined by inference. No person is able to testify that they looked in another's mind and saw therein certain knowledge or a certain purpose or intention to do harm to another. Because direct evidence of the defendant's state of mind is rarely available, intent is generally proved by circumstantial evidence. The only way a jury can ordinarily determine what a person's conduct was at any given time is by determining what that person's conduct was and what the circumstances were surrounding that conduct and from that infer what their intention was.

"To draw such an inference is a proper function of a jury, provided, of course, that the inference drawn complies with the standards for inferences as explained in connection with my instruction on circumstantial evidence. The inference is not a necessary one. You're not required to infer a particular intent from the defendant's conduct or statements, but it is an inference that you may draw if you find it reasonable and logical. I again remind you that the burden of proving intent beyond a reasonable doubt is on the state."

Recently, our Supreme Court addressed whether general intent or criminal negligence is the appropriate mens rea for the "unjustifiably injures" clause[21] of § 53-247 (a) and stated in relevant part: "Section 53-247 is comprised of subsections (a) through (e). Subsections (b) through (e) each include explicit specific intent terms, specifically, 'maliciously and intentionally,' 'knowingly,' and 'intentionally,' that apply to all of the acts proscribed by the particular subsection. . . . In contrast, § 53-247 (a) lacks a mens rea term that applies to every proscribed act listed therein and, instead, contains some clauses that include a specific intent term and others that do not. . . . This differing structure strongly supports a conclusion that the legislature did

not intend for all of the acts proscribed by § 53-247 (a) to be accompanied by the same mens rea. Additionally, unlike the [unjustifiably injures] clause, in other clauses of § 53-247 (a), the adverb 'unjustifiably' appears in conjunction with additional language that clearly requires specific intent. Specifically, the clause under which the defendant was convicted refers to any person who 'unjustifiably injures any animal,' but other portions of subsection (a) later refer to any person who 'unjustifiably administers any poisonous or noxious drug or substance to any domestic animal or unjustifiably exposes any such drug or substance, with intent that the same shall be taken by an animal . . . .' " (Citations omitted; emphasis omitted.) *State* v. *Josephs*, 328 Conn. 21, 27–28, 176 A.3d 542 (2018).

"This plainly indicates that, in § 53-247 (a), 'unjustifiably' means something different from 'intentionally' and that the legislature will include specific intent language along with the word 'unjustifiably' when it intends for a specific intent to apply. . . . The legislature's differing treatment of these two clauses within the same subsection convinces us that the 'unjustifiably injures any animal' clause, under which the defendant was charged, requires only a general intent. . . .

"The defendant argues that we should read a specific intent requirement into the prohibition in § 53-247 (a) against 'unjustifiably injur[ing]' an animal because subsection (b) of § 53-247 punishes 'maliciously and intentionally' maiming, mutilating, torturing, wounding or killing an animal . . . . [T]here is a clear reason for an additional mens rea element in subsection (b), namely, the punishment imposed by subsection (b) is more severe than that imposed by subsection (a). . . .

"[T]he plain and unambiguous language of the clause in § 53-247 (a) that the defendant was charged with violating required only a general intent when read in the context of the entirety of subsection (a) and within § 53-247 as a whole. Accordingly, the trial court properly concluded that the state was not required to prove that the defendant possessed the specific intent to injure Wiggles."[22] (Citations omitted.) Id., 28–30.[23]

In the present case, the relevant language of § 53-247 (a) is, "[a]ny person . . . having impounded or confined any animal, [who] fails to give such animal proper care . . . or, having charge or custody of any animal . . . fails to provide it with proper food, drink or protection from the weather . . . shall, for a first offense, be fined not more than one thousand dollars or imprisoned not more than one year or both, and for each subsequent offense, shall be guilty of a class D felony." General Statutes § 53-247 (a). The defendant concedes that the legislature did not include specific intent provisions in the relevant portion of § 53-247 (a). Thus, in accordance with *State* v. *Josephs*, supra, 328 Conn. 21, we conclude that the mens rea required for a conviction under the

relevant portion of § 53-247 (a) is general intent and that the trial court did not err by declining to instruct the jury on criminal negligence.

### III

Third, the defendant claims that § 53-247 (a), when applied to his conduct, is unconstitutionally vague.[24]

The defendant correctly acknowledges that he did not preserve this claim at trial. The defendant argues, however, that the claim is reviewable under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989). Under *Golding*, "a defendant can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation . . . exists and . . . deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt. In the absence of any one of these conditions, the defendant's claim will fail." (Emphasis in original; footnote omitted.) Id.; see *In re Yasiel R.*, 317 Conn. 773, 781, 120 A.3d 1188 (2015) (modifying third prong of *Golding*).

The defendant's claim meets the first two prongs of *Golding* and is, therefore, subject to review. First, the record is adequate to review because it reflects both that the defendant was convicted under § 53-247 (a) and contains the basis of his conviction. See *State* v. *Rocco*, 58 Conn. App. 585, 589, 754 A.2d 196, cert. denied, 254 Conn. 931, 761 A.2d 757 (2000). Second, a claim that a statute is unconstitutionally vague implicates a defendant's fundamental due process right to fair warning. Id. We conclude, however, that the defendant's claim fails to satisfy the third prong of *Golding* because the alleged constitutional violation does not exist.[25]

We begin by setting forth the relevant legal principles. "The determination of whether a statutory provision is unconstitutionally vague is a question of law over which we exercise de novo review." *State* v. *Winot*, 294 Conn. 753, 758–59, 988 A.2d 188 (2010). "The void for vagueness doctrine is a procedural due process concept that originally was derived from the guarantees of due process contained in the fifth and fourteenth amendments to the United States constitution. . . . The constitutional injunction that is commonly referred to as the void for vagueness doctrine embodies two central precepts: the right to fair warning of the effect of a governing statute or regulation and the guarantee against standardless law enforcement. . . .

"If the meaning of a statute can be fairly ascertained a statute will not be void for vagueness since [m]any statutes will have some inherent vagueness, for [i]n

most English words and phrases there lurk uncertainties. . . . For statutes that do not implicate the especially sensitive concerns embodied in the first amendment, we determine the constitutionality of a statute under attack for vagueness by considering its applicability to the particular facts at issue. . . .

"In challenging the constitutionality of a statute, the defendant bears a heavy burden. To prevail on his vagueness claim, [t]he defendant must demonstrate beyond a reasonable doubt that the statute, as applied to him, deprived him of adequate notice of what conduct the statute proscribed or that he fell victim to arbitrary and discriminatory enforcement. . . . The proper test for determining [whether] a statute is vague as applied is whether a reasonable person would have anticipated that the statute would apply to his or her particular conduct. . . . The test is objectively applied to the actor's conduct and judged by a reasonable person's reading of the statute . . . .

"If the language of a statute fails to provide definite notice of prohibited conduct, fair warning can be provided by prior judicial opinions involving the statute . . . or by an examination of whether a person of ordinary intelligence would reasonably know what acts are permitted or prohibited by the use of his common sense and ordinary understanding." (Internal quotation marks omitted.) *State* v. *Pettigrew*, 124 Conn. App. 9, 24–25, 3 A.3d 148, cert. denied, 299 Conn. 916, 10 A.3d 1052 (2010).

As stated previously, § 53-247 (a) provides in relevant part: "Any person . . . who, having impounded or confined any animal, fails to give such animal proper care . . . or, having charge or custody of any animal . . . fails to provide it with proper food, drink or protection from the weather . . . shall, for a first offense, be fined not more than one thousand dollars or imprisoned not more than one year or both . . ."

The defendant asserts that the ambiguity in the terms "charge" and "custody" did not provide notice that he bore the responsibility of caring for the goats and, "therefore, what 'proper care' was required of *him*."[26] (Emphasis in original.) We agree with the defendant that these terms may be susceptible to some degree of interpretation. See *State* v. *Josephs*, supra, 328 Conn. 32 ("unjustifiably injures" in § 53-247 [a] susceptible to differing interpretations); *State ex rel. Gregan* v. *Koczur*, supra, 287 Conn. 157 ("proper care" and "proper food" as used in § 53–247 [a] are susceptible to wide range of interpretations and could be vague as applied to some situations); *Bethlehem* v. *Acker*, 153 Conn. App. 449, 472, 102 A.3d 107 (concluding phrase proper "protection from the weather" susceptible to some degree of interpretation), cert. denied, 315 Conn. 908, 105 A.3d 235 (2014). Our review of the record in the present case, however, reveals that an objective

reading of § 53-247 (a) provides definite notice that the defendant's conduct violated the statute.

Thus, we now turn to whether these terms "charge" and "custody," as used in § 53-247 (a), provide sufficient notice to a reasonable person as to when criminal liability attaches for failing to provide adequate care for an animal. As the statute provides, a person violates § 53-247 (a) when, having "charge or custody of any animal," he fails to give that animal "proper food, drink or protection from the weather . . . ." General Statutes § 53-247 (a). For the reasons discussed in part I of this opinion, the plain meaning of the relevant portion of § 53-247 (a) is that a person who bears the responsibility of caring for an animal must give that animal proper care. The record contains ample evidence that a reasonable person in the defendant's position would know that he bore the responsibility of caring for the goats and, thus, could face criminal liability for failing to do so. In review, the defendant brought the goats to the farm and negotiated an oral lease with Hurlburt to house the goats in the barn. He was engaged in a business that used the goats' milk to make cheese. The evidence reflects that, initially, the defendant came to the farm frequently to provide care for the goats. Moreover, he represented himself to the members of the department as the owner of the goats and as someone responsible for their care. Last, the defendant contacted Kane when the department instructed that the goats be examined by a veterinarian and continued to communicate with her after her visit.

The state argues that § 53-247 (a) is not susceptible to arbitrary enforcement because the statute only subjects individuals who have "charge" or "custody" of an animal to criminal liability for failing to give that animal proper care. We agree with the state because, contrary to what the defendant argues, the terms limit criminal liability to those who have the responsibility to care for an animal. As the evidence reflects, a reasonable person in the defendant's position would know that his conduct fell within the statute's prohibited conduct and that he could face criminal liability for his improper treatment of the goats. Rather than creating a risk of standardless law enforcement, the terms "charge" and "custody" limit who may be prosecuted under § 53-247 (a).

The defendant's vagueness challenge is further undermined by the evidence that he had notice that his conduct violated the law. A "defendant's special knowledge may undermine his . . . vagueness challenge . . . ." *State* v. *Jason B.*, 248 Conn. 543, 567, 729 A.2d 760, cert. denied, 528 U.S. 967, 120 S. Ct. 406, 145 L. Ed. 2d 316 (1999). In the present case, representatives from the department informed the defendant prior to the time of his arrest that his treatment of the goats violated the animal cruelty statute. Sherman advised the defendant

that his conduct was in violation of the animal cruelty statute, and the defendant responded by stating that "he was familiar with the law . . . ." Kane informed the defendant that the goats' nutrition needed to be improved. Members of the department told the defendant to provide heat lamps and shelter from the wind. The record reflects, however, that the defendant did not act on this instruction. Instead, the defendant allowed the condition of the goats to continue to deteriorate.

IV

Last, the defendant claims that his conviction of nineteen charges of animal cruelty violated the prohibition against double jeopardy under the state and federal constitutions because the term "any animal" in § 53-247 (a) refers to a species of animal, not an individual animal.[27]

The defendant correctly acknowledges before this court that he failed to present this claim, in any form, before the trial court. The defendant argues, however, that the claim is reviewable under *State* v. *Golding*, supra, 213 Conn. 239–40. See part III of this opinion. Insofar as the defendant's claim is based on a violation of the prohibition against double jeopardy afforded under the state and federal constitutions, the claim is reviewable under *Golding* because the record is adequate for review and the claim is of constitutional magnitude. See, e.g., *State* v. *Chicano*, 216 Conn. 699, 704–705, 584 A.2d 425 (1990), cert. denied, 501 U.S. 1254, 111 S. Ct. 2898, 115 L. Ed. 2d 1062 (1991), overruled in part on other grounds by *State* v. *Polanco*, 308 Conn. 242, 261, 61 A.3d 1084 (2013); *State* v. *Kurzatkowski*, 119 Conn. App. 556, 568, 988 A.2d 393, cert. denied, 296 Conn. 902, 991 A.2d 1104 (2010). The defendant claims that he was convicted and sentenced for nineteen counts for one offense in a single trial. "A defendant may obtain review of a double jeopardy claim, even if it is unpreserved, if he has received [multiple] punishments for [multiple] crimes, which he claims were one crime, arising from the same transaction and prosecuted at one trial . . . ." (Internal quotation marks omitted.) *State* v. *Urbanowski*, 163 Conn. App. 377, 386–87, 136 A.3d 236 (2016), aff'd, 327 Conn. 169, 172 A.3d 201 (2017).

Thus, we turn to an evaluation of the defendant's claim to determine whether a double jeopardy violation exists and deprived him of a fair trial.[28] "A defendant's double jeopardy challenge presents a question of law over which we have plenary review." (Internal quotation marks omitted.) Id., 387. The double jeopardy clause of the fifth amendment to the United States constitution provides: "nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb . . . ." U.S. Const., amend. V. "This constitutional guarantee prohibits . . . multiple punishments for the

same offense in a single trial." (Internal quotation marks omitted.) *State* v. *Wright*, 319 Conn. 684, 689, 127 A.3d 147 (2015). "The defendant on appeal bears the burden of proving that the prosecutions are for the same offense in law and fact." (Internal quotation marks omitted.) *State* v. *Miranda*, 260 Conn. 93, 120–21, 794 A.2d 506, cert. denied, 537 U.S. 202, 123 S. Ct. 224, 154 L. Ed. 2d 175 (2002).

The United States Supreme Court has "recognized that the Double Jeopardy Clause consists of several protections: It protects against a second prosecution for the same offense after acquittal. It protects against a second prosecution for the same offense after conviction. And it protects against multiple punishments for the same offense. . . . These protections stem from the underlying premise that a defendant should not be twice tried or punished for the same offense. . . . The Clause operates as a bar against repeated attempts to convict, with consequent subjection of the defendant to embarrassment, expense, anxiety, and insecurity, and the possibility that he may be found guilty even though innocent." (Citations omitted; internal quotation marks omitted.) *Schiro* v. *Farley*, 510 U.S. 222, 229–30, 114 S. Ct. 783, 127 L. Ed. 2d 47 (1994).

"The proper double jeopardy inquiry when a defendant is convicted of multiple violations of the *same* statutory provision is whether the legislature intended to punish the individual acts separately or to punish only the course of action which they constitute." (Emphasis in original.) *State* v. *Rawls*, 198 Conn. 111, 121, 502 A.2d 374 (1985). "The issue, though essentially constitutional, becomes one of statutory construction." (Internal quotation marks omitted.) *State* v. *Knight*, 56 Conn. App. 845, 855, 747 A.2d 13 (2000). Therefore, the question before us becomes whether the legislature in enacting § 53-247 (a) intended to authorize multiple convictions for cruelty towards each goat or one conviction for the cruel treatment of the nineteen goats.

Whether § 53-247 (a) was intended to create a per animal unit of prosecution is a question of statutory interpretation, which is a question of law subject to plenary review. As previously stated, "[t]he meaning of a statute shall, in the first instance, be ascertained from the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered. . . . [E]very case of statutory interpretation . . . requires a threshold determination as to whether the provision under consideration is plain and unambiguous. This threshold determination then governs whether extratextual sources can be used as an interpretive tool. . . . [O]ur case law is clear that ambiguity exists only if the statutory

language at issue is susceptible to more than one plausible interpretation." (Citations omitted; internal quotation marks omitted.) *State* v. *Richard P.*, 179 Conn. App. 676, 684–85,    A.3d   , cert. denied, 328 Conn. 924,    A.3d    (2018).

The defendant argues that § 53-247 (a) is ambiguous because the phrase "any animal" is subject to multiple interpretations. The phrase "any animal," however, is not ambiguous. The legislature's decision to use the singular "animal," rather than the plural "animals," is crucial to our analysis. The plain meaning of the singular word "animal" is that our animal cruelty statute was intended to create a per animal unit of prosecution. In addition, the legislature did not use the term "species" or the phrase, "class of animal."

In the present case, although the defendant's conduct in mistreating the animals occurred over the same period of time and consisted of the same general acts, each of the charged offenses pertained to a different, identifiable goat. The state filed one count for each of the nineteen goats that received a body score of one when the department evaluated the herd after it was removed from the defendant's custody. The record supports the proposition that each goat needed to be fed and watered separately. Each goat was starving; some were so severely deprived of nutrients that they could not move and were left to wallow in their own feces. The defendant failed to provide each goat with veterinary care for their various injuries and wounds. The record reveals that each goat suffered different, individualized ailments and contains photographs depicting each goat's suffering. The defendant's separate abuse and maltreatment of each goat supports the nineteen separate counts filed by the prosecutor. Simply put, the defendant's cruelty to each goat constituted a separate crime.

Even if we assume, arguendo, that the statute is ambiguous, we would still reach the conclusion that the § 53-247 (a) delineates a per animal unit of prosecution. "When a statute is not plain and unambiguous, we also look for interpretive guidance to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation . . . ." (Internal quotation marks omitted.) *State* v. *Rodriguez-Roman*, 297 Conn. 66, 75, 3 A.3d 783 (2010).

Comparing § 53-247 (a) to other statutes supports our conclusion that the legislature intended to adopt a per animal unit of prosecution. The legislature has passed other legislation that expressly contains provisions that apply to groups of one or more animals, collectively. General Statutes § 29-108a provides in relevant part: "The terms 'animals' and 'animal,' as used in this chapter and in [§ 53-247] . . . shall include all brute creatures and birds." Failure to afford the term "animal" and

"animals" different meaning would render the statutory language surplusage. See *State* v. *Pommer*, 110 Conn. App. 608, 614, 955 A.2d 637, cert. denied, 289 Conn. 951, 961 A.2d 418 (2008). Additionally, in General Statutes § 53-252[29] the term "animals" is used to describe one offense for transporting one or more animals by train. The use of the term "animals" in other statutes reveals that when a particular statute is intended to refer to a group of animals, collectively, the term "animals" is used. Thus, the legislature uses the plural, "animals," when it intends to, and that suggests that the failure to use that term in § 53-247 (a) was purposeful. See *Hartford/Windsor Healthcare Properties*, *LLC* v. *Hartford*, 298 Conn. 191, 205, 3 A.3d 56 (2010).

Moreover, "[t]he manifest purpose of [§ 53-247 (a)] is to ensure that no impounded or confined animal . . . is exposed by its caretaker to conditions harmful to its health or well-being." *State* v. *Acker*, 160 Conn. App. 734, 746, 125 A.3d 1057 (2015), cert. denied, 320 Conn. 915, 131 A.3d 750 (2016). The underlying intent of the statute supports the conclusion that it effectuates a per animal unit of prosecution. Given that the core purpose of the statute is to protect animals, it is consistent with the intent of the statute to conclude that the cruel treatment of each individual animal constitutes a separate violation.

Additionally, shifting views on the purpose for animal cruelty statutes during the nineteenth century, when the phrase "any animal" was codified in an early form of the animal cruelty statute, supports interpreting § 53-247 (a) to effectuate a per animal unit of prosecution. Prior to the enactment of animal cruelty statutes, "[g]iven the limited view of animal rights, cruelty to animals as such was not recognized as a criminal offense at common law." M. Livingston, "Desecrating the Ark: Animal Abuse and the Law's Role in Prevention," 87 Iowa L. Rev. 1, 22 (2001). In the early nineteenth century, early forms of animal cruelty statutes were enacted to protect property interests in animals by criminalizing the mistreatment of economically valuable animals belonging to another person. Id., 24. By the mid-nineteenth century, however, "there were tentative legislative impulses toward criminal penalties for animal cruelty, regardless of whether the perpetrator's actions affected someone else's property interests. An 1821 Maine statute forbade the cruel beating of horses or cattle, without regard to ownership, and subjected the offender to a fine of between two and five dollars or a jail term of up to thirty days. A similar 1829 New York enactment added sheep to the list of protected animals and prohibited the cruel beating or torture of such animals, regardless of whether they belonged to the defendant or another party. Following this early lead . . . Connecticut . . . adopted similar anticruelty provisions by [1875],[30] expanding the Maine and New York acts to include other animals." (Footnote added; foot-

notes omitted; internal quotation marks omitted.) Id., 26. At that time, animal cruelty legislation was passed "as incident to the progress of civilization, and as the direct outgrowth of that tender solicitude for the brute creation which keeps pace with man's increased knowledge of their life and habits, laws, such as the one under consideration, have been enacted by the various states having the common object of protecting these dumb creatures from ill treatment by man. Their aim is not only to protect these animals, but to conserve public morals, both of which are undoubtedly proper subjects of legislation. With these general objects all right-minded people sympathize." *Waters* v. *People*, 23 Colo. 33, 35, 46 P. 112 (1896).

The trend associated with animal cruelty statutes—from no liability at common law to criminalizing animal cruelty to protect sentient animals in the interest of morality—supports concluding that § 53-247 (a) effectuates a per animal unit of prosecution. In order to maximize the protection of animals and preserve public morals, the term "any animal," read in light of the societal shifts when this phrase was adopted in an early form of our animal cruelty statute, must attach separate criminal liability for each mistreated animal. Thus, in the present case, § 53-247 (a), which contains many similarities to the animal cruelty statute enacted in 1874, should be interpreted to protect each of the nineteen goats from ill treatment. In the present case, the defendant's nineteen separate charges for the cruel treatment of nineteen different goats did not violate the prohibition against double jeopardy.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] The trial court sentenced the defendant to ten years incarceration, execution suspended after forty months, followed by three years of probation.

[2] Hall testified that the quality of hay depends on when it is cut. The first cut in the spring is higher quality and contains higher amounts of protein. The summer cut, the type Hall found at the farm, is lower quality and contains more waste.

[3] Katherine Kane, a veterinarian, explained during her testimony that the term "downed" refers to goats that are either quadriplegic or paraplegic.

[4] Saanen goats are "a Swiss breed of white or light color usu. hornless short-haired dairy goats." Webster's New International Dictionary (3d Ed. 2002).

[5] Kane learned when she arrived at the farm that Sherman wanted to speak with her to apprise her of the situation before her visit and that it was Sherman who requested the necropsy. The defendant did not tell Kane this because, in his words, he did "not respect authority . . . ."

[6] Kane explained that meningeal worm is a parasite of white-tailed deer. It can cause neurological deficits in other animals. It is quite rare in goats.

[7] Kane explained that coccidia are protozoal parasites that can cause severe illness. They are transmitted through fecal contamination and can be treated with sulfa drugs, a portion of proper herd management.

[8] Kane testified that nematodes are gastrointestinal parasites of goats. It is a common parasite of goats and requires good management to treat it. Nematodes can cause anemia and ill-thrift, which is essentially "[n]ot doing well . . . ."

[9] Kane described this as "[m]uscle wasting; when you are not intaking enough calories you will start to burn your own muscle, start to digest your own muscle. And so an animal that has been starved has no muscle left because they've used all that protein to subsist and serious atrophy of fat,

you'll use your fat even before you use your muscle. Any fat stores you have and in a normal individual there's fat stores, normal fat stores in various places of the body even if the animal is not fat and you expect to see in places throughout the body when there is severe starvation that fat is used by the body and serious atrophy it is turned into a liquid to turn into energy for the body to function."

[10] Kane testified that splenic extramedullary hematopoiesis occurs in a heavily parasitized animal that cannot produce enough red blood cells from its bone marrow. In order to compensate, the spleen, which is the storage area for red blood cells, begins to produce more red blood cells.

[11] The average score of 2.5 was buoyed by the kids, and it does not account for the forty-seven goats that perished before the department confiscated the herd.

[12] The mistreatment of the nineteen goats that received scores of one is the basis for the nineteen separate counts of animal cruelty against the defendant.

[13] Nubian goats are "a breed of large, long-eared North African goats having a Roman nose and predominantly brown or black hair: noted for their rich milk." Random House Webster's Unabridged Dictionary (2d Ed. 2001).

[14] There was evidence that chronic suppurative bronchopneumonia and pleuritis is a type of pneumonia that afflicts the lungs and the lining of the thoracic cavity and made it difficult for the goat to breathe.

[15] Kane testified that chronic lymphoplasmacytic tracheitis is the inflammation of the trachea.

[16] Kane explained that centrilobular hepatocellular atrophy refers to atrophy, necrosis, and congestion of the cells in the liver.

[17] The goats that tested positive for Johne's disease were not able to recover as well as the other goats. By May, 2015, one goat with this ailment had lost weight, despite the department's efforts, and another diseased goat gained only 3.6 pounds.

[18] The defendant argues that the court's instruction misled the jury because it did not differentiate between "charge or custody" and "confinement." Insofar as the defendant is now, on appeal, folding into his insufficiency claim an instructional error claim that the court's charge misled the jury on the elements the state must prove to support a conviction pursuant to § 53-247 (a), we decline to address that argument. Pursuant to Practice Book § 67-4 (d) claims must be divided into separate parts, and each point must include a separate brief statement of the appropriate standard of review in order to be adequately briefed. As the defendant has not provided this, we decline to review any claim of instructional error with regard to the court's instruction on the elements of § 53-247 (a). See *Carmichael* v. *Stonkus*, 133 Conn. App. 302, 308, 34 A.3d 1026, cert. denied, 304 Conn. 911, 39 A.3d 1121 (2012).

[19] We are not concluding that the court's jury instruction provided an exhaustive list of what the terms "confined," "charge," and custody" mean in the context of § 53-247 (a).

[20] We take judicial notice of the file in which Bryson was also charged with animal cruelty for her role in the failure to provide proper care for the goats. She pleaded guilty on June 3, 2016.

[21] The unjustifiably injures clause of § 53-247 (a) provides in relevant part: "Any person who . . . unjustifiably injures any animal . . . shall, for a first offense, be fined not more than one thousand dollars or imprisoned not more than one year or both, and for each subsequent offense, shall be guilty of a class D felony." General Statutes § 53-247 (a).

[22] The defendant in *Josephs* shot a cat named Wiggles with a BB gun. *State* v. *Josephs*, 328 Conn. 21, 24, 176 A.3d 542 (2018).

[23] We do not fault either party for failing to cite to *Josephs* in their briefs, as this appeal was argued December 17, 2017, and *Josephs* was officially released on January 30, 2018. The defendant's claim was an unanswered question at the time briefs were filed, which our Supreme Court has now addressed in *Josephs*. Pursuant to Practice Book § 67-10, the state filed a citation of supplemental authorities after oral argument to this court to provide notice that the decision was released and that it was relevant to the issues raised in this appeal. The defendant did not respond.

[24] The defendant is not making a facial challenge to § 53-247 (a).

[25] The defendant has not specified whether his vagueness claim is under the federal or state constitution. Accordingly, our review of the defendant's claim is limited to the protections of the federal constitution.

[26] The defendant also argues that the statute is impermissibly vague because it does not contain a mens rea provision. As discussed in part II

of this opinion, our Supreme Court, in *Josephs*, has concluded that the "plain and unambiguous" language of § 53-247 (a); *State* v. *Josephs*, supra, 328 Conn. 29; makes clear that the mens rea standard is general intent. Id. Thus, the defendant's arguments pertaining to mens rea warrant no further discussion.

[27] Although this claim presents an issue of first impression, in a prior case, this court affirmed a defendant's conviction of multiple counts of animal cruelty for one course of action that affected multiple animals. See *State* v. *Acker*, 160 Conn. App. 734, 739, 125 A.3d 1057 (2015) (defendant charged with sixty-three counts of animal cruelty, each count based on his conduct toward distinct dog, and convicted of fifteen counts), cert. denied, 320 Conn. 915, 131 A.3d 750 (2016).

[28] The defendant alleges a violation of his rights under the state and federal constitutions. The defendant has not provided an independent state constitutional analysis of his vagueness claim. As a result, the state claim is deemed abandoned and review is limited to federal constitutional provisions. See *State* v. *Jarrett*, 82 Conn. App. 489, 498 n.5, 845 A.2d 476, cert. denied, 269 Conn. 911, 852 A.2d 741 (2004). In addition, we observe, and the defendant concedes, that this court and our Supreme Court have held that with respect to the protection against double jeopardy, the state constitution does not afford greater protection than that afforded by its federal counterpart. See, e.g., *State* v. *Michael J.*, 274 Conn. 321, 354, 875 A.2d 510 (2005) ("Connecticut appellate courts never have held that the double jeopardy guarantees implied in the state constitution exceed those embodied in the federal constitution").

[29] General Statutes § 53-252 provides: "No railroad company, in transporting *animals*, shall permit them to be confined in cars more than twenty-eight consecutive hours, except when transported in cars in which *they* have proper food, water, space and opportunity for rest, without unloading them for food, water and rest, for at least five consecutive hours, unless prevented by storm or other accidental cause; and, in estimating such confinement, the time during which the animals have been confined, without such rest, on connecting roads from which *they* are received, shall be included. *Animals* so unloaded shall be properly fed, watered and sheltered during such rest by the owner or person having their custody or, on his neglect, by the railroad company transporting them, at his expense; and such company shall, in such case, have a lienupon such *animals* for food, care and custody furnished and shall not be liable for any detention of them for such purpose. Any such company or the owner or custodian of such *animals*, who does not comply with the provisions of this section, shall be fined not more than five hundred dollars. The knowledge and acts of agents of, and of persons employed by, such company, in regard to *animals* transported, owned or employed by it or in its custody, shall be held to be its acts and knowledge." (Emphasis added.)

[30] General Statutes (1875 Rev.) tit. 20, c. 8, § 14, contained the phrase "any animal" and provided in relevant part: "Every person who over-drives, drives when over-loaded, overworks, tortures, deprives of necessary sustenance, mutilates, or cruelly beats or kills *any animal*, or causes it to be done; and every person who, having the charge or custody of any such animal inflicts unnecessary cruelty upon it, or unnecessarily fails to provide it with proper food, drink or protection from the weather, or who cruelly abandons, or carries it in an unnecessarily cruel manner, shall be fined not more than two hundred and fifty dollars, or imprisoned not more than one year, or both." (Emphasis added.)