******************************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

## STATE OF CONNECTICUT *v.* ANTHONY V.*
## (AC 45621)

Clark, Seeley and Palmer, Js.

*Syllabus*

Convicted, following a jury trial, of the crime of manslaughter in the first degree with a firearm, the defendant appealed to this court. It was undisputed that the victim was killed by a gunshot wound to the head from the defendant's replica Civil War era revolver. When he was interviewed by the police, the defendant contended that the victim had been in the bathroom, using the toilet, while he was cleaning the revolver in the bedroom. He further contended that, when he was holding the revolver and walking into the bathroom for a napkin, he had tripped and fallen toward the victim. In falling, he lost control of the revolver, the barrel of which struck the victim's head, and it accidentally discharged. At trial, the state produced uncontested evidence that the fatal wound was inflicted by a single shot from the defendant's revolver, the revolver had an extremely light trigger pull, and the revolver had been pressed against the victim's head and behind her left ear when the gun discharged. *Held*:

1. The defendant could not prevail on his claim that there was insufficient evidence to support the judgment of conviction: the evidence and the inferences that the jury reasonably could have drawn therefrom were sufficient to support the state's theory that the defendant intentionally placed the loaded revolver against the victim's head, including testimony by the state medical examiner that the gunshot that killed the victim was discharged while the muzzle of the revolver was flush against the victim's head, and the jury reasonably could have found that the likelihood of that occurring randomly or haphazardly, as the defendant claimed, was slight; moreover, there was evidence that the defendant and the victim had a volatile relationship, which was fueled by drug and alcohol use, and the defendant's actions with the revolver did not display sound judgment; furthermore, the jury could have doubted the veracity of the defendant's statements concerning his handling of the revolver the evening of the shooting, as the jury was not obligated to accept the defendant's version of the facts and reject the factual scenario advanced by the state.

2. The trial court committed plain error in failing to instruct the jury on the element of general intent, which was an essential element of the offense of manslaughter in the first degree with a firearm: because the statements

---

* In accordance with our policy of protecting the privacy interests of the victims of family violence, we decline to identify the victim or others through whom the victim's identity may be ascertained. See General Statutes § 54-86e.

the defendant made to the police, if credited by the jury, supported his contention that the revolver struck the victim's head accidentally, the defendant was entitled to a jury instruction that the state bore the burden of proving that he had placed the revolver to the victim's head intentionally; moreover, the consequences of the court's error were so grievous as to be fundamentally unfair or manifestly unjust under the circumstances of this case, as an instruction on general intent that fully explained the requirement of volitional or deliberate conduct as distinguished from conduct that was inadvertent or accidental was vital to a fair trial and a reliable verdict; accordingly, the defendant was entitled to a new trial.

Argued January 11—officially released August 13, 2024

*Procedural History*

Substitute information charging the defendant with the crime of manslaughter in the first degree with a firearm, brought to the Superior Court in the judicial district of New Haven and tried to the jury before *Alander, J.*; verdict and judgment of guilty, from which the defendant appealed to this court. *Reversed*; *new trial.*

*Denis J. O'Malley III*, assistant public defender, with whom was *Kevin Semataska*, deputy assistant public defender, for the appellant (defendant).

*Danielle Koch*, deputy assistant state's attorney, with whom, on the brief, were *John P. Doyle, Jr.*, state's attorney, and *Lisa D'Angelo* and *Adrienne Russo*, assistant state's attorneys, for the appellee (state).

*Opinion*

PALMER, J. The defendant, Anthony V., appeals from the judgment of conviction, rendered after a jury trial, of manslaughter in the first degree with a firearm in violation of General Statutes §§ 53a-55a[1] and 53a-55 (a)

---

[1] General Statutes § 53a-55a provides in relevant part: "(a) A person is guilty of manslaughter in the first degree with a firearm when he commits manslaughter in the first degree as provided in section 53a-55, and in the commission of such offense he uses, or is armed with and threatens the use of or displays or represents by his words or conduct that he possesses a pistol, revolver, shotgun, machine gun, rifle or other firearm. . . ."

(3).[2] The defendant claims that (1) the evidence is insufficient to support his conviction and (2) the court's failure to instruct the jury on general intent constituted plain error. Although we disagree with the defendant's claim of evidentiary insufficiency, we agree with his claim of instructional error under the plain error doctrine. Accordingly, we reverse the judgment of the trial court.

The following facts, which the jury reasonably could have found, and procedural history are relevant to our resolution of this appeal. Shortly before midnight on Saturday, October 17, 2020, New Haven police officers responded to a call reporting that an individual had been shot in a local apartment. When the police arrived at the apartment, they discovered the defendant, who resided there, in a small bathroom,[3] with blood all over the floor, performing cardiopulmonary resuscitation (CPR) on the victim. The victim, who resided with the defendant and planned to marry him, had suffered a gunshot wound to the head and was pronounced dead at the scene by medical personnel. A handgun belonging to the defendant was found on the bathroom floor and seized by the police.

The defendant consented to three police interviews, all of which were videotaped and, along with the interview transcripts, admitted as full exhibits at trial. In his interview statements,[4] the defendant consistently

---

[2] General Statutes § 53a-55 provides in relevant part: "(a) A person is guilty of manslaughter in the first degree when . . . (3) under circumstances evincing an extreme indifference to human life, he recklessly engages in conduct which creates a grave risk of death to another person, and thereby causes the death of another person."

[3] Evidence adduced at trial reveals that the bathroom, which included a vanity, a toilet and a bathtub, was only about thirty-five square feet, measuring four feet, ten inches (the distance from the doorway to the wall behind the toilet) by seven feet, three inches.

[4] The interviews took place on October 18, 2020, the day after the victim's death, and on October 23, 2020, and January 29, 2021.

maintained that the victim's death was the result of a tragic accident. More specifically, the defendant stated that, just before bedtime, the victim was using the toilet in the bathroom adjacent to the couple's bedroom, with the door open, when the defendant decided to wipe down the loaded revolver that he kept in a box in the bedroom and cleaned off periodically to remove any accumulated dust and oil. Aware that there were napkins in the bathroom that he could use to do so—the couple had run out of toilet paper—the defendant, loaded revolver in hand, walked toward the bathroom to retrieve a napkin. While approaching the bathroom, his eyes were focused on the revolver, which he was trying, unsuccessfully, to render safe by disabling its discharge mechanism.[5] As he started to enter the bathroom, he tripped on the doorjamb and fell forward, toward the victim, who was seated on the toilet only a few feet away. Although still in possession of the revolver as he fell, the defendant could not control it, and the barrel of the gun inadvertently struck the side of the victim's head, and the gun accidentally discharged, killing the victim.

At trial, the state advanced a markedly different theory with respect to the events leading up to the victim's death. Although the state did not claim that the defendant intended to shoot the victim, the prosecutor asserted in closing argument that the evidence established that the defendant entered the bathroom with the loaded revolver and intentionally pressed the muzzle of the revolver forcefully against the victim's head, just behind her left ear. According to the prosecutor, the defendant's conduct in placing the revolver to the victim's head likely was the result of "another one of [the]

---

[5] For a further explication of the defendant's statement regarding his effort to render the revolver safe, see footnote 10 of this opinion and accompanying text.

alcohol and drug fueled arguments" between the defendant and the victim. The prosecutor further argued that the defendant's reckless conduct evinced his extreme indifference to the victim's life by subjecting her to a grave risk of death and thereby causing her death when he unintentionally pulled the trigger and discharged the revolver.[6]

At the conclusion of the trial, the jury found the defendant guilty of manslaughter in the first degree with a firearm. The trial court rendered judgment in accordance with the jury verdict and sentenced the defendant to a term of imprisonment of twenty-five years, execution suspended after eighteen years, followed by three years of probation. This appeal followed. Additional facts and procedural history will be set forth as necessary.

I

The defendant first claims that the state failed to prove beyond a reasonable doubt that he was guilty of manslaughter in the first degree with a firearm because the evidence does not support the state's theory that he intentionally placed the loaded revolver against the victim's head.[7] The defendant contends, instead, that

---

[6] The defendant did not testify at trial. His version of events was presented to the jury through the statements he gave to the police and by defense counsel in closing argument.

[7] With respect to the state's theory of the case, in his initial closing argument, the prosecutor told the jury that "the state's theory is that the defendant showed an extreme indifference to the life of [the victim] and created a grave risk of her death when he pressed a loaded . . . revolver to the side of her head while aware that, in doing so, a substantial and unjustifiable risk existed of unintentional discharge." The prosecutor then stated, "I'll say it again," and repeated verbatim the state's theory of the case. In defense counsel's closing argument, he maintained that the evidence did not support the state's theory of the case and asserted that the shooting occurred in the manner described by the defendant in his interview statements to the police. Then, near the end of the prosecutor's rebuttal argument, he told the jury, without objection, that the defendant had committed manslaughter in the first degree with a firearm "regardless of which version you believe, whether he pressed the firearm up against [the victim's] head forcefully or

the evidence demonstrates that the "cause of the gun coming up against [the victim's] head was not a volitional act" by the defendant but, rather, "a tragic, calamitous accident." We are not persuaded.[8]

We first set forth the well established legal principles that govern our consideration of the defendant's challenge to the sufficiency of the evidence. "In reviewing

he was handling it and tripped." The prosecutor then briefly summarized, without specific reference to the state's theory that the defendant had intentionally pressed the revolver against the victim's head, why the defendant "was extremely reckless [on the] night" the victim was killed. See footnote 17 of this opinion. On appeal, the defendant's claim of insufficient evidence is predicated on the state's theory of the case as stated by the prosecutor in his initial closing argument. Moreover, despite some language in the state's brief arguably suggesting that conduct by the defendant short of placing the revolver to the victim's head would suffice to prove the offense of manslaughter in the first degree with a firearm, we do not read the state's brief as relying on the claim that the jury could have found the defendant guilty of that offense under the defendant's own version of events. Rather, the state's brief repeatedly explains why the evidence supports the state's theory that the defendant intentionally placed the fully loaded revolver against the victim's head. In response to questions during oral argument before this court, however, the state did assert that the facts alleged by the defendant himself were sufficient to constitute the offense of manslaughter in the first degree with a firearm. Because both parties' briefs focus on the state's theory of the case as articulated repeatedly and unequivocally by the prosecutor in his initial closing argument, and because the parties seemingly agree that the jury verdict was based on that theory, our review of the defendant's claim of evidentiary insufficiency is also limited to that theory of the case.

[8] Because the defendant acknowledges that the evidence adduced at trial was sufficient to support a jury finding of the lesser included offense of criminally negligent homicide in violation of General Statutes § 53a-58 (a), a misdemeanor; see footnote 12 of this opinion; and because the trial court instructed the jury on that lesser included offense (as well as the lesser included offense of manslaughter in the second degree with a firearm in violation of General Statutes § 53a-56a (a)), the defendant contends that this court should reverse the judgment of conviction of manslaughter in the first degree with a firearm on the ground of evidentiary insufficiency and remand the case to the trial court with direction to render a judgment of conviction of criminally negligent homicide and for resentencing. See, e.g., *State* v. *Desimone*, 241 Conn. 439, 460 n.28, 696 A.2d 1235 (1997) (when trial evidence does not support defendant's conviction of offense charged, reviewing court may modify judgment to reflect conviction of lesser included

the sufficiency of the evidence to support a criminal conviction we apply a [two part] test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [jury] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . .

"In particular, before this court may overturn a jury verdict for insufficient evidence, it must conclude that no reasonable jury could arrive at the conclusion the jury did. . . . Although the jury must find every element proven beyond a reasonable doubt in order to find the defendant guilty of the charged offense . . . each of the basic and inferred facts underlying those conclusions need not be proved beyond a reasonable doubt. . . .

"If it is reasonable and logical for the [jury] to conclude that a basic fact or an inferred fact is true, the [jury] is permitted to consider the fact proven and may consider it in combination with other proven facts in determining whether the cumulative effect of all the evidence proves the defendant guilty of all the elements of the crime charged beyond a reasonable doubt." (Citations omitted; internal quotation marks omitted.) *State* v. *Waters*, 214 Conn. App. 294, 301–302, 280 A.3d 601, cert denied, 345 Conn. 914, 284 A.3d 25 (2022).

"Moreover, it does not diminish the probative force of the evidence that it consists, in whole or in part, of evidence that is circumstantial rather than direct. . . .

offense if evidence was sufficient to support conviction of lesser included offense on which jury properly had been instructed and jury's verdict necessarily included finding that defendant was guilty of lesser offense). In light of our conclusion that the evidence was sufficient to support his conviction of manslaughter in the first degree with a firearm, and our conclusion in part II of this opinion that he is entitled to a new trial on that charge, we reject the defendant's proposed remand order.

It is not one fact . . . but the cumulative impact of a multitude of facts which establishes guilt in a case involving substantial circumstantial evidence. . . . In evaluating evidence, the [jury] is not required to accept as dispositive those inferences that are consistent with the defendant's innocence. . . . The [jury] may draw whatever inferences from the evidence or facts established by the evidence [that] it deems to be reasonable and logical. . . .

"Additionally, given the nature of this appeal, it is important to underscore that there is a fine line between the making of reasonable inferences and engaging in speculation—the jury is allowed to do the former. . . . However, [t]he line between permissible inference and impermissible speculation is not always easy to discern. When we infer, we derive a conclusion from proven facts because such considerations as experience, or history, or science have demonstrated that there is a likely correlation between those facts and the conclusion. If that correlation is sufficiently compelling, the inference is reasonable. But if the correlation between the facts and the conclusion is slight, or if a different conclusion is more closely correlated with the facts than the chosen conclusion, the inference is less reasonable. At some point, the link between the facts and the conclusion becomes so tenuous that we call it speculation. When that point is reached is, frankly, a matter of judgment. . . .

"[P]roof of a material fact by inference from circumstantial evidence need not be so conclusive as to exclude every other hypothesis. It is sufficient if the evidence produces in the mind of the trier a reasonable belief in the probability of the existence of the material fact. . . . Thus, in determining whether the evidence supports a particular inference, we ask whether that inference is so unreasonable as to be unjustifiable. . . . In other words, an inference need not be compelled by

the evidence; rather, the evidence need only be reasonably susceptible of such an inference." (Citations omitted; internal quotation marks omitted.) *State* v. *Richards*, 196 Conn. App. 387, 396–97, 229 A.3d 1157 (2020), aff'd, 339 Conn. 628, 261 A.3d 1165, cert. denied,     U.S.     , 142 S. Ct. 431, 211 L. Ed. 2d 255 (2021).

Finally, "proof beyond a reasonable doubt does not mean proof beyond all possible doubt . . . nor does proof beyond a reasonable doubt require acceptance of every hypothesis of innocence posed by the defendant that, had it been found credible by the [jury], would have resulted in an acquittal. . . . On appeal, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the [jury's] verdict of guilty." (Internal quotation marks omitted.) *State* v. *Kenneth B.*, 223 Conn. App. 270, 274, 308 A.2d 82, cert. denied, 348 Conn. 952, 308 A.3d 1038 (2024).

Of course, the elements of the offense of which the defendant was convicted provide the context in which we apply the foregoing principles. "A person is guilty of manslaughter in the first degree with a firearm when he commits manslaughter in the first degree as provided in section 53a-55, and in the commission of such offense he uses . . . a pistol, revolver, shotgun, machine gun, rifle or other firearm. . . ." General Statutes § 53a-55a (a). General Statutes § 53a-55 (a) provides in relevant part that: "A person is guilty of manslaughter in the first degree when . . . (3) under circumstances evincing an extreme indifference to human life, he recklessly engages in conduct which creates a grave risk of death to another person, and thereby causes the death of another person." Accordingly, for the defendant to be found guilty of manslaughter in the first degree with a firearm, "the state had to prove beyond a reasonable doubt the following: (1) that the defendant engaged in

conduct that created a grave risk of death; (2) that in doing so the defendant acted recklessly; (3) under circumstances evincing an extreme indifference to human life; and (4) the defendant caused the death of the victim. . . . Additionally, the state had to prove that the defendant had the general intent to engage in conduct that created a grave risk of death to another person under circumstances evincing extreme indifference to human life." (Internal quotation marks omitted.) *Leon* v. *Commissioner of Correction*, 189 Conn. App. 512, 539, 208 A.3d 296, cert. denied, 332 Conn. 909, 209 A.3d 1232 (2019).

"A person acts 'recklessly' with respect to a result or to a circumstance described by a statute defining an offense when he is aware of and consciously disregards a substantial and unjustifiable risk that such result will occur or that such circumstance exists. The risk must be of such nature and degree that disregarding it constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation . . . ." General Statutes § 53a-3 (13). "[T]he legislature has provided some guidance as to the level of indifference it intended in § 53a-55 (a) (3) by modifying the level of indifference with the adjective extreme. Extreme is defined as existing at the highest or greatest possible degree, and is synonymous with excessive. . . . The adjective grave is defined as very serious: dangerous to life. . . . Our Supreme Court has concluded that the mental state required for a violation of § 53a-55 (a) (3) was clear. . . . Recklessness involves a subjective realization of a risk and a conscious decision to ignore that risk . . . ." (Citation omitted; internal quotation marks omitted.) *State* v. *Wade*, 106 Conn. App. 467, 479, 942 A.2d 1085, cert. granted, 287 Conn. 908, 950 A.2d 1286 (2008) (appeal withdrawn June 12, 2008).

Finally, manslaughter in the first degree with a firearm is a general intent crime requiring only that the

actor have the general intent to perform the acts that constitute the elements of the offense. See *Leon* v. *Commissioner of Correction*, supra, 189 Conn. App. 539. "[G]eneral intent is the term used to define the requisite mens rea for a crime that has no stated mens rea; the term refers to whether a defendant intended deliberate, conscious or purposeful action, as opposed to causing a prohibited result through accident, mistake, carelessness, or absent-mindedness. [When] a particular crime requires only a showing of general intent, the prosecution need not establish that the accused intended the precise harm or precise result which resulted from his acts."[9] (Emphasis omitted; internal quotation marks omitted.) *State* v. *Juan J.*, 344 Conn. 1, 21, 276 A.3d 935 (2022). With these principles in mind, we turn to the defendant's arguments and the state's counterarguments made in support of their opposing positions regarding the sufficiency of the evidence. In addressing those arguments, we also set forth certain additional facts that the state and the defendant contend substantiate their version of events.

We note, preliminarily, that three significant facts are not in dispute. First, the state and the defendant agree that the victim's fatal wound was inflicted by one shot fired from the defendant's handgun, a fully operational .44 caliber Pietta replica of a Civil War era 1851 Colt Navy revolver. The revolver is more than twelve inches long and has six chambers for ammunition. Those chambers are arranged on a cylinder, which, with each pull of the trigger, rotates and brings a new chamber in line with the muzzle, thereby readying the revolver for the next shot. In contrast to modern day revolvers, the Pietta replica revolver does not use bullets in the form of metallic self-contained cartridges. Rather, each

---

[9] General intent, which is "an intent to engage in certain conduct," is to be distinguished from specific intent, which is "an intent to bring about a certain result." *State* v. *Salamon*, 287 Conn. 509, 572, 949 A.2d 1092 (2008).

chamber is loaded separately with black powder, a lead ball projectile, and a percussion cap. When the shooter pulls the trigger, the revolver's hammer strikes the percussion cap, crushing it and igniting the sparking agent inside of it. That, in turn, ignites the powder, which propels the projectile out of the barrel.

Additionally, the shooter must cock the hammer fully back before pulling the trigger in order to discharge the revolver; when the hammer is in the half-cocked position, the revolver cannot be fired, unless, for example, the revolver is dropped or the hammer is otherwise struck and inadvertently placed in the fully cocked position. Thus, the only reason to have the hammer fully cocked back is to discharge the revolver. To clean, unload, and maintain the revolver, the hammer must be in the half-cocked position, which allows the user to rotate the cylinder, remove the percussion caps, and safely handle the revolver. Nevertheless, the best way to render an otherwise loaded Pietta replica revolver completely safe is to remove the percussion caps because the revolver cannot be discharged, even when the hammer is fully cocked, unless the percussion caps are in place.[10]

A second undisputed fact relates to the revolver's exceedingly light "trigger pull," which refers to the amount of rearward force that must be applied to the trigger to release the firing mechanism. Dennis Lyons, a firearms expert with the Rhode Island State Crime Laboratory, testified that a single action firearm, like the defendant's revolver, ordinarily requires three to six pounds of force on the trigger to release the hammer. The trigger pull test that Lyons performed on the

---

[10] In his statements to the police, the defendant explained that, as he was walking toward the bathroom seconds before the victim was killed, he was trying to remove the percussion caps from the revolver's cylinder so that the revolver could not be fired. According to the defendant, however, he tripped over the doorjamb before he was able to do so.

revolver, however, revealed that only 0.98 pounds of force on the trigger will release the fully cocked hammer. Lyons described the revolver's trigger pull as "extremely light" and among the lightest he had ever seen, characterizing it as a "hair trigger." Sergeant John Cavanna, a firearms expert and the firearms training division supervisor of the Hartford Police Department, also testified about the trigger pull of the defendant's revolver, explaining that "something is different" with the revolver, and that its uniquely light trigger pull might be due to a manufacturer's defect or a modification of the revolver.

A third uncontested fact is the nature of the victim's fatal gunshot wound, which establishes that the muzzle of the revolver was pressed against the victim's head when the shot was discharged. James R. Gill, the state's chief medical examiner who performed an autopsy on the victim's body, testified that the entrance wound from the bullet, which was located behind the victim's left ear, was a blowback laceration. This type of laceration occurs only when the muzzle of a firearm is pressed against the body and the weapon is fired. As Gill explained, "where the muzzle is pressed against the skin, all of the gunshot wound residue goes into the wound, all of the gas goes into the wound, and that's when you're going to see that blowback laceration." Gill further explained that, although the muzzle need not be completely flush with the skin to create a blowback laceration, but could possibly be at a "slight angle," he also opined that it would be "very unlikely" that even a small portion of the muzzle was not directly against the victim's head when the revolver was discharged.

As previously indicated, the state's theory of the case, as expressed by the prosecutor in closing argument, was that "this was no accident. This was a result of the

defendant's extremely reckless and unjustifiable conduct on October 17, 2020," at which time he exhibited "an extreme indifference to the life of [the victim] and created a grave risk of her death when he pressed a loaded . . . revolver to the side of her head while aware that, in doing so, a substantial and unjustifiable risk existed of unintentional discharge." The defendant has not argued that intentionally placing a fully loaded revolver against another person's head under the circumstances presented here would not suffice to support a conviction of manslaughter in the first degree with a firearm if that conduct were proven beyond a reasonable doubt. Rather, the defendant claims that the state's evidence fell short of establishing that he engaged in such conduct. For the following reasons, we agree with the state that the evidence was sufficient to support its contention regarding the conduct of the defendant that resulted in the victim's death.

Because of the blowback laceration on the victim's head caused by the fatal shot, it is undisputed that the muzzle of the revolver was against her head and behind her left ear when the gun discharged. To decide the case, however, the jury was required to ascertain, on the basis of the evidence, what caused the revolver to be positioned in that manner. Although the state could not present direct evidence of what occurred leading up to the fatal shot, under the circumstances of the present case, Gill's unchallenged testimony that the shot was discharged while the revolver was positioned directly against the side of the victim's head is evidence that the revolver was placed there intentionally. As the state points out, the defendant asserts in his brief to this court that the evidence adduced at trial "tells a clear story," namely, that the victim's death "was the result of a calamitous moment in which [the defendant] tripped" and, as he was falling, "the unwieldy revolver," which he "held in front of him," "move[d] with him,

uncontrolled," and then, "haphazardly came into contact with the victim's head" before the trigger was accidentally "grazed and the gun fired, killing [the victim]." Although the jury certainly was free to credit this alleged confluence of events, the jury also was entitled to believe, in light of Gill's testimony, that it was considerably more likely that the revolver discharged only after the muzzle was firmly and intentionally pressed flush against the victim's head rather than by random happenstance.

The state also introduced evidence that permitted the jury to conclude that the defendant and the victim had a troubled and tumultuous relationship. For example, a neighbor who resided in the apartment adjacent to the defendant and the victim testified that their relationship was "volatile," and that she could hear yelling and banging through the wall separating her apartment from that of the defendant and the victim. According to the neighbor, she often heard such yelling and arguing, describing its frequency as "multiple times a week . . . at least four [occasions per week]." In addition, on one morning approximately one week prior to October 17, 2020, the neighbor observed a mark and swelling above the victim's eye after having heard the victim and the defendant arguing the night before. The neighbor also testified that the victim would text her or tap on the wall when "things [with the defendant] got too heated," and the neighbor would then call the victim and "make up an excuse" why she needed the victim to come to her apartment. As a victim of domestic violence herself, the neighbor was very upset about the abusive nature of the victim's relationship with the defendant, and she spoke about it with the victim and members of the victim's family, including the victim's brother and the victim's daughter.

Evidence further revealed that, on October 15, 2020, two days before the victim's death, the defendant and

the victim engaged in a text message conversation in which the victim stated, "I'm out. Never needed you and still don't in my life . . . . You gonna suffer . . . ." At one point during that text message conversation, the defendant stated, "I would stay away because someone going to jail tonight." The victim responded, "I don't ever wanna come back to 108 or 109," a reference to the defendant's apartment (108) and the adjacent apartment in which the victim had resided before moving in with the defendant (109). The defendant told the police that he and the victim were arguing on the night of October 17, 2022, although he also stated that "it was nothing" but a "disagreement." Nevertheless, the neighbor's testimony and the text messages exchanged by the victim and the defendant shortly before the victim was killed reflect a volatile and deteriorating relationship marked by ongoing, serious and apparently even violent conflict and discord.

The defendant also acknowledged to the police that he consumed a twenty-five ounce beer and a shot of brandy that night, but he further stated that he had stopped drinking at approximately 6 p.m. Although the defendant was not certain exactly how much the victim had to drink that night, he did know that she continued to drink throughout the evening, and a toxicology report revealed that she had an extremely high blood alcohol content of 0.236. In addition, the toxicology report revealed that the victim had cocaine in her system. According to the defendant, the victim was a "recreational" cocaine user, which, the defendant further stated, explained the various drug paraphernalia found in their bedroom. The defendant also told the police that it had been "irresponsible" of him to enter the bathroom with the fully loaded revolver, without first disabling it by removing the percussion caps, while the victim was sitting on the toilet, and that doing so was a "dumb decision."

With respect to the revolver, the defendant told the police that he had shot the revolver once before, several months before the victim was killed, and fired one shot, just to make sure the gun was operable. He further stated that the "antique pistol" was "a very complicated thing," that it was "not really the safest thing," and that it "should've never been loaded. The caps should've never been on it." The defendant stated, as well, that he would not allow the victim to handle the revolver because "it's an older weapon that's not as safe as the modern weapons." In response to police questioning, the defendant stated that putting the percussion caps on the revolver made him a "nervous wreck," and that he was uncomfortable handling the revolver. He explained, in addition, that he kept the revolver loaded only because of the crime and violence in his neighborhood.[11]

The state's evidence also established, as explained previously, that a shot cannot be discharged from the revolver when the hammer is in the half-cocked position, which is the position used to clean, maintain, and load the gun. A shot can be discharged from the revolver only when the hammer is fully cocked. In his statements to the police, however, the defendant claimed that he was not aware that the revolver had a half-cocked position even though he had loaded the gun in that position himself because, according to the undisputed testimony, that is the only position in which it can be loaded. The defendant also told the police that he had not fully cocked the revolver when the victim was shot even though the revolver could not have discharged unless

---

[11] The defendant told the police that it seemed that "people were getting shot every other day" in his neighborhood, and that, a few months prior to October 17, 2020, during the summer, he discovered "a big blood stain in [his apartment] parking spot" where someone had been shot. He further explained that, after discovering that blood stain so near his apartment, he began keeping the revolver, fully loaded, in his bedroom and occasionally took the gun out to wipe it free of dust and oil.

it was in a fully cocked position. Finally, the defendant stated that the revolver was not pointed at anything when it went off, an assertion that is flatly contradicted by Gill's testimony that the muzzle of the revolver was flush against the victim's head when the shot was fired.

Regarding the defendant's statement to the police that he went into the bathroom to retrieve some napkins to wipe down the revolver, the evidence established that there also were napkins on the adjacent bed and on the bureau next to the bathroom doorway, just feet away from the defendant. As the prosecutor argued to the jury, it is difficult to understand why the defendant elected to go into the small, cramped bathroom while the victim was on the toilet to get napkins when there also were napkins more or less right in front of him in the bedroom.

According to the defendant, because of the nature of the Pietta replica revolver and his relative unfamiliarity with it, he had to consult the revolver's instructional manual to get directions on how to handle and use it. The manual, which was admitted into evidence as a full exhibit, contains warnings about the use of the revolver. For example, in the section of the manual entitled "Loading," the manual states, "Never carry the gun with the hammer resting on a percussion cap! A light accidental blow to the hammer can readily cause the gun to discharge." Under the heading, "Warning," the user is cautioned to load only five of the revolver's six chambers to avoid an accidental discharge and to never carry the revolver with the hammer resting on a percussion cap. Under a similar heading, the manual underscores the importance of always handling and carrying the revolver with the hammer resting on the uncapped and unloaded chamber. The manual further warns the user to "[o]nly place a percussion cap on cylinder when you are ready to fire. Failure to do so can result in an accidental discharge causing injury, death or property

damage." The jury reasonably could have found that the defendant was irresponsible insofar as he apparently knew of these warnings but essentially chose to disregard them.

We conclude that this evidence and the inferences that the jury reasonably could have drawn therefrom were sufficient to support the state's theory that the defendant intentionally placed the muzzle of the revolver to the victim's head. On the basis of Gill's testimony that the shot that killed the victim was discharged while the muzzle of the revolver was flush against the victim's head, the jury reasonably could have found that the likelihood of that occurring randomly or haphazardly, as the defendant claimed, was slight. The evidence also permitted the jury to find that there was substantial conflict between the defendant and the victim, that they argued frequently and loudly, and that the volatility of their relationship was exacerbated by drug and alcohol use. Furthermore, the jury reasonably could have questioned the soundness of the defendant's judgment because, by his own admission, he was entering the small, cramped bathroom while carrying his fully loaded and operable replica antique revolver without first disabling it by removing the percussion caps—even though he knew that his revolver was particularly dangerous and made him uncomfortable—while the victim was on the toilet. In addition, the jury could have doubted the veracity of the defendant's statements concerning his handling of the revolver that evening, including his assertion that he did not know how the hammer became fully cocked and the shot fired. Moreover, because there were napkins readily within the defendant's reach, only feet away from him in the bedroom, the jury could have discredited the defendant's assertion that his reason for entering the bathroom was to retrieve a napkin.

The defendant claims that the jury reasonably could not have rejected his version of the events as set forth in his police interviews. Among other things, he argues: he would not have been distraught and attempting CPR on the victim if he was so angry or upset with her that he intentionally placed the revolver to her head; the evidence did not permit an inference that his relationship with the victim was so fraught and turbulent that he would have placed her in grave jeopardy the way the state postulated he did; because the evidence indicated that he was sober that night, the state's theory of an alcohol and drug fueled confrontation with the victim in the bathroom is unsupportable; and, because he had only discharged the revolver once, he was unaware that it had a hair trigger that could be pulled with only the slightest rearward pressure.

We do not find the defendant's arguments so compelling as to require the conclusion that the jury rationally could not have found as it did. With respect to his efforts to resuscitate the victim, it is entirely plausible that he never intended to harm the victim physically and, aghast by what had occurred, wanted to do everything possible to revive her. Whether the relationship between the victim and the defendant was sufficiently volatile and troubled to have prompted the defendant to place the loaded revolver against the victim's head—albeit without the intent to shoot her—was a determination for the jury, not this court, to make on the basis of all of the evidence and the jury's assessment of the defendant's judgment. Although the defendant told the police that he had stopped drinking much earlier in the evening and the police indicated that the defendant was not noticeably impaired or intoxicated when they arrived at his apartment, his exact condition is unknown. Moreover, the victim was quite inebriated, and whatever encounter or disagreement the victim and the defendant had that evening might well have been

exacerbated by what had occurred between the two of them earlier that day, when both were drinking, or by the heated text discussion they had two days earlier, or both. Although the defendant indicated that he did not know how easily the trigger of the revolver could be pulled and a shot fired, the state maintained, not unreasonably, that he likely was aware of the gun's hair trigger because he had shot the revolver only a few months earlier.

Finally, the defendant admitted to the police that it was irresponsible of him to carry his fully loaded revolver into the very small bathroom while the victim was seated on the toilet without first disabling the revolver completely by removing the percussion caps. Indeed, on appeal, the defendant has acknowledged that he was criminally negligent in causing the victim's death, that is, he "fail[ed] to perceive a substantial and unjustifiable risk" that his conduct would result in the victim's death, a risk that was of "such nature and degree that the failure to perceive it constitute[d] a gross deviation from the standard of care that a reasonable person would observe in the situation . . . ." See General Statutes §§ 53a-58 (a) and 53a-3 (14).[12] Of course, because manslaughter in the first degree with a firearm is a significantly greater offense than criminally negligent homicide and requires a significantly greater quantum of proof, the defendant's admission that he committed the lesser included offense of criminally negligent homicide; see footnote 8 of this opinion; is alone

---

[12] General Statutes § 53a-58 (a) provides in relevant part that "[a] person is guilty of criminally negligent homicide when, with criminal negligence, he causes the death of another person . . . ."

General Statutes § 53a-3 (14) provides that "[a] person acts with 'criminal negligence' with respect to a result or to a circumstance described by a statute defining an offense when he fails to perceive a substantial and unjustifiable risk that such result will occur or that such circumstance exists. The risk must be of such nature and degree that the failure to perceive it constitutes a gross deviation from the standard of care that a reasonable person would observe in the situation . . . ."

insufficient to support a finding that he committed the greater offense of manslaughter in the first degree with a firearm. In finding the defendant culpable of that greater offense, however, the jury may have been influenced by the defendant's concession that, even under his theory of the case, he exercised exceedingly poor judgment by engaging in dangerously irresponsible conduct under the circumstances presented.

We conclude, therefore, that the jury was not obligated to accept the defendant's version of the facts and to reject the factual scenario advanced by the state. "Nothing in our criminal jurisprudence mandates that a jury accept a defendant's version of events or the reasonable inferences that flow therefrom." (Internal quotation marks omitted.) *State* v. *Ortiz*, 252 Conn. 533, 572, 747 A.2d 487 (2000). Rather, "[t]he [jury] is free to juxtapose conflicting versions of events and to determine which is more credible." (Internal quotation marks omitted.) *State* v. *Brown*, 198 Conn. App. 630, 637, 233 A.3d 1258, cert. denied, 335 Conn. 942, 237 A.3d 730 (2020). Furthermore, "we are mindful that [w]e do not sit as a [seventh] juror who may cast a vote against the verdict based upon our feeling that some doubt of guilt is shown by the cold printed record. . . . The scope of our factual inquiry on appeal is limited. This court cannot substitute its own judgment for that of the jury if there is sufficient evidence to support the jury's verdict." (Internal quotation marks omitted.) *State* v. *Leandry*, 161 Conn. App. 379, 384, 127 A.3d 1115, cert. denied, 320 Conn. 912, 128 A.3d 955 (2015). Because the evidence, viewed in the light most favorable to sustaining the verdict, supports the jury's guilty finding, we reject the defendant's claim of evidentiary insufficiency.

II

The defendant also contends that the court improperly failed to instruct the jury on an essential element

of the offense of manslaughter in the first degree with a firearm, namely, that the defendant acted with general intent, that is, volitionally, in allegedly placing the muzzle of the revolver firmly against the victim's head. Because the defendant did not raise this claim in the trial court, he seeks to prevail under the plain error doctrine.[13] We agree with the defendant's plain error claim and, accordingly, conclude that he is entitled to a new trial.

Certain well established principles guide our analysis of the defendant's plain error claim. "[T]he plain error

---

[13] The defendant's unpreserved claim of a constitutionally deficient jury instruction is deemed to have been implicitly waived, and therefore not subject to direct appeal under the bypass rule of *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989) (holding that unpreserved claims of constitutional magnitude may be raised for first time on appeal if, inter alia, record is adequate for review), as modified by *In re Yasiel R.*, 317 Conn. 773, 781, 120 A.3d 1188 (2015), because, as the defendant concedes, the trial court complied with the requirements of *State* v. *Kitchens*, 299 Conn. 447, 10 A.3d 942 (2011), in which our Supreme Court held that, "when the trial court provides [presumptively competent] counsel with a copy of the proposed jury instructions, allows a meaningful opportunity for their review, solicits comments from counsel regarding changes or modifications and counsel affirmatively accepts the instructions proposed or given, the defendant may be deemed to have knowledge of any potential flaws therein and to have waived implicitly the constitutional right to challenge the instructions on direct appeal." Id., 482–83. The defendant nevertheless maintains that, insofar as the *Kitchens* waiver rule is "based on the presumption that counsel was aware of, and rejected as a matter of trial strategy, every conceivable challenge to the jury instructions"; *State* v. *Bellamy*, 323 Conn. 400, 417, 147 A.3d 655 (2016); the rule should not apply to the present case because it would be "patently absurd" to presume that "defense counsel decided it would be a good idea to relieve the state of its burden of proof" on the important element of intent. Our Supreme Court, however, has not heretofore recognized such an exception to *Kitchens*. In contrast, in *State* v. *McClain*, 324 Conn. 802, 155 A.3d 209 (2017), our Supreme Court carved out an exception to *Kitchens* for purposes of plain error review, reasoning, in part, that "there simply is no reason why [presumptively] competent counsel would *intentionally* relinquish the right to review of an error dire enough to be contemplated by the plain error rule." (Emphasis in original.) Id., 815. Accordingly, although we conclude that the defendant's constitutional claim of instructional impropriety was waived pursuant to *Kitchens*, we consider the defendant's plain error claim.

doctrine, codified at Practice Book § 60-5, is an extraordinary remedy used by appellate courts to rectify errors committed at trial that, although unpreserved . . . are of such monumental proportion that they threaten to erode our system of justice and work a serious and manifest injustice on the aggrieved party. [T]he plain error doctrine . . . is not . . . a rule of reviewability. It is a rule of reversibility. That is, it is a doctrine that this court invokes in order to rectify a trial court ruling that, although either not properly preserved or never raised at all in the trial court, nonetheless requires reversal of the trial court's judgment . . . for reasons of policy. . . . In addition, the plain error doctrine is reserved for truly extraordinary situations [in which] the existence of the error is so obvious that it affects the fairness and integrity of and public confidence in the judicial proceedings. . . . Plain error is a doctrine that should be invoked sparingly. . . . Implicit in this very demanding standard is the notion . . . that invocation of the plain error doctrine is reserved for occasions requiring the reversal of the judgment under review. . . .

"An appellate court addressing a claim of plain error first must determine if the error is indeed plain in the sense that it is patent [or] readily [discernible] on the face of a factually adequate record, [and] also . . . obvious in the sense of not debatable. . . . This determination clearly requires a review of the plain error claim presented in light of the record.

"Although a complete record and an obvious error are prerequisites for plain error review, they are not, of themselves, sufficient for its application. . . . [I]n addition to examining the patent nature of the error, the reviewing court must examine that error for the grievousness of its consequences in order to determine whether reversal under the plain error doctrine is appropriate. . . . [Thus, an appellant] cannot prevail under

[the plain error doctrine] . . . unless he demonstrates that the claimed error is *both* so clear *and* so harmful that a failure to reverse the judgment would result in manifest injustice. . . . [Our] review . . . with respect to plain error is plenary." (Emphasis in original; internal quotation marks omitted.) *State* v. *Silva*, 339 Conn. 598, 605–606 n.6, 262 A.3d 113 (2021).

The following principles govern our consideration of the defendant's challenge to the trial court's jury instructions, which provides the basis for his claim of plain error. "When reviewing the challenged jury instruction . . . we must adhere to the well settled rule that a charge to the jury is to be considered in its entirety, read as a whole, and judged by its total effect rather than by its individual component parts. . . . [T]he test of a court's charge is not whether it is as accurate upon legal principles as the opinions of a court of last resort but whether it fairly presents the case to the jury in such a way that injustice is not done to either party under the established rules of law. . . . As long as [the instructions] are correct in law, adapted to the issues and sufficient for the guidance of the jury . . . we will not view the instructions as improper. . . .

"It is . . . constitutionally axiomatic that the jury be instructed on the essential elements of a crime charged. . . . [Moreover, constitutional principles of due process protect] an accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged. . . . Consequently, the failure to instruct a jury on an element of a crime deprives a defendant of the right to have the jury told what crimes he is actually being tried for and what the essential elements of those crimes are. . . .

"A jury instruction is constitutionally adequate if it provides the jurors with a clear understanding of the

elements of the crime charged, and affords them proper guidance for their determination of whether those elements were present. . . . An instruction that fails to satisfy these requirements would violate the defendant's right to due process of law as guaranteed by the fourteenth amendment to the United States constitution and article first, § 8, of the Connecticut constitution. . . . The test of a charge is whether it is correct in law, adapted to the issues and sufficient for the guidance of the jury." (Internal quotation marks omitted.) *State* v. *Hearl*, 182 Conn. App. 237, 259–60, 190 A.3d 42, cert. denied, 330 Conn. 903, 192 A.3d 425 (2018). Ultimately, the primary purpose of the jury charge is to assist the jurors, unfamiliar with the legal principles pertaining to the case, "in applying the law correctly to the facts which they might find to be established." (Internal quotation marks omitted.) Id., 260.

As we have explained, the mens rea element of the offense of manslaughter in the first degree with a firearm required proof that "the defendant had the general intent to engage in conduct that created a grave risk of death to another person under circumstances evincing extreme indifference to human life." (Internal quotation marks omitted.) *Leon* v. *Commissioner of Correction*, supra, 189 Conn. App. 539; see also General Statutes §§ 53a-55 (a) (3) and 53a-55a. Our Supreme Court has observed that the offense of manslaughter in the first degree with a firearm, "like any other crime of affirmative action . . . require[s] something in the way of a mental element-at least an intention to make the bodily movement which constitutes the act which the crime requires. . . . Such an intent, to perform certain acts proscribed by a statute, we have referred to as the general intent ordinarily required for crimes of commission rather than omission." (Internal quotation marks omitted.) *State* v. *Gonzalez*, 300 Conn. 490, 502, 15 A.3d 1049 (2011); see also *State* v. *Pierson*, 201 Conn. 211,

216, 514 A.2d 724 (1986). As also noted previously, the requirement of general intent is satisfied by proof that the defendant's act or movement was deliberate, conscious or purposeful and not merely an accident or mistake. See *State* v. *Juan J.*, supra, 344 Conn. 21. In other words, "the state needed to prove . . . that the defendant intended to make the bodily movement [that] constitutes the act [that] the crime requires . . . ." (Internal quotation marks omitted.) Id., 22.

In the present case, therefore, the state was required to "prove . . . that the [defendant] acted volitionally to use . . . [the revolver] in the commission of the offense" by intentionally placing it against the victim's head. *State* v. *Gonzalez*, supra, 300 Conn. 503. Thus, "[t]hat the [defendant] intend[ed] to perform the physical acts that constitute the crime . . . in the manner proved by the [state's] evidence [was] implicitly a part of the state's burden of proof and, in that sense, an element of the crime." (Citation omitted; internal quotation marks omitted.) Id., 502 n.14; see also *State* v. *Pierson*, supra, 201 Conn. 216–17. Because the interview statements that the defendant gave to the police, if credited by the jury, support the defendant's contention that the revolver struck the victim's head accidentally, the defendant's right to a fair trial entitled him to a jury instruction that the state bore the burden of proving, contrary to his version of events, that he had intentionally placed the revolver against the victim's head.[14]

---

[14] We note that the defendant would not have been entitled to a jury instruction on general intent if his intent was not implicated by the defense theory of the case because "[a] trial court is not . . . required to instruct a jury about the principle that 'a criminal act must be volitional' or that the defendant must have the 'general intent to do a criminal act' unless there is evidence at trial that suggests that 'the defendant's conduct was involuntary. . . .' *State* v. *Pierson*, supra, [201 Conn.] 217–18." *State* v. *Gonzalez*, supra, 300 Conn. 502 n.14. In the present case, however, it is abundantly clear that such an instruction was required in view of his version of events and the evidence adduced at trial in support thereof.

Indeed, as the defendant correctly points out, his intent with respect to the positioning of the revolver—whether he intentionally placed it against the victim's head while she was sitting on the toilet or it happened to land there, tragically and by accident, when the defendant tripped and fell into the bathroom—"was not only in dispute but was the central dispute of the trial."

Defense counsel did not file a written request to charge, nor did he otherwise seek an instruction on general intent. Moreover, although the trial court's proposed jury instructions addressed all the other elements of the offense, those instructions contained no express reference to the general intent requirement. Indeed, the instructions made no mention of intent at all. Defense counsel expressed his approval of those instructions, however, and, thereafter, took no exception to the jury charge as given, which also contained no explicit reference to the intent requirement.

Nevertheless, although the jury was under no obligation to accept the defendant's assertion that the revolver accidentally struck the victim's head and discharged following his fall into the bathroom, the defendant correctly maintains that the jury reasonably could not have appreciated the significance of his version of events without an instruction advising the jury of the general intent requirement. In the absence of such an instruction, the jury could have found the defendant guilty on the basis of acts or movements by him that were not volitional or intentional but, rather, accidental or involuntary. As a constitutional matter, the omission of an instruction on an element of the offense requires a new trial unless the state can establish beyond a reasonable doubt that the omitted element was uncontested and supported by overwhelming evidence. See, e.g., *State* v. *Newton*, 330 Conn. 344, 371–72, 194 A.3d 272 (2018). Here, the element of general intent was vigorously contested, and the state's evidence, although sufficient to

prove the state's theory of the case, was entirely circumstantial and cannot fairly be characterized as overwhelming.

The state argues, however, that the defendant is not entitled to a new trial under the plain error doctrine despite the lack of an express instruction on general intent. According to the state, although the trial court did not explicitly instruct the jury on general intent, its charge on the element of recklessness was sufficient to inform the jury of that intent requirement. In support of its claim, the state relies on the following portion of the court's instruction: "The third essential element is that the defendant engaged . . . in such conduct recklessly.[15] Under our law, a person acts recklessly with respect to a result or to a circumstance described by a statute defining an offense *when he . . . is aware of and consciously disregards a substantial and unjustifiable risk that such result will occur or that such circumstance exists.* The risk must be of such a nature or degree that disregarding it constituted a gross deviation from the standard of conduct that a reasonable person would have observed in the situation. You determine the standard of conduct of a reasonable person in the same situation as the defendant by determining what a reasonably prudent person would have done or not done in such a situation and under such circumstances. A gross deviation is a great or substantial deviation, not simply a slight or moderate deviation. There must be a great or substantial difference between, on the . . . one hand, *the defendant's conduct in consciously disregarding a substantial and unjustifiable*

---

[15] Just prior to its instruction on recklessness, the court explained to the jury that the first essential element of the crime of manslaughter in the first degree with a firearm required the state to prove that "the defendant shot [the victim] with a firearm" and that the second such element required proof that "the defendant engaged in conduct which created a grave risk of death to" the victim.

*risk* and, on the other hand, what a reasonable person would have done or not done under the circumstances.

"Here, *the risk which the state must prove beyond a reasonable doubt that the defendant was aware of but consciously disregarded when he engaged in his challenged conduct* is as follows: A risk that such conduct would cause the death of [the victim], which was not only substantial and unjustifiable, but grave or extremely serious. The state must further establish that disregarding that risk was a gross deviation from the standard of conduct that a reasonable person would have observed in the defendant's situation." (Emphasis added; footnote added.)

The state maintains that the foregoing instruction on recklessness "incorporated an instruction on general intent because one cannot be aware of and *disregard* a substantial and unjustifiable risk if they do not have the general intent to engage in such conduct in the first place. . . . This [instructional] language necessarily required the jury to find that the defendant had the general intent to engage in the conduct, the extreme risk of which he had to be aware of and affirmatively disregard." (Emphasis in original.)

Notwithstanding the trial court's instructions on recklessness, we disagree with the state that the court's jury charge adequately apprised the jury of the separate and distinct element of general intent. There has never been any dispute either that the victim's death was caused by the loaded revolver that the defendant carried with him into the bathroom or that the defendant was in possession of the revolver when it accidentally discharged, killing the victim. The critical issue for the jury, rather, was whether the defendant intentionally pressed the muzzle of the revolver against the victim's head just before the shot was fired, or whether the revolver inadvertently struck the defendant's head and

accidentally discharged when the defendant tripped over the doorjamb and fell into the victim. In such circumstances, the absence of an express reference in the court's instructions to the state's burden of establishing that the victim's death resulted from the defendant's volitional conduct left the jury without the guidance necessary to resolve the primary question it was required to answer. When, as here, there is evidence to support the defendant's contention that the conduct resulting in the victim's death was accidental, an instruction on general intent that fully explains the requirement of volitional or deliberate conduct as distinguished from conduct that is inadvertent or accidental is vital to a fair trial lest the jury find the defendant guilty on the basis of such unintentional conduct. See *State* v. *Martin*, 189 Conn. 1, 13, 454 A.2d 256 (defendant's claim that he accidently engaged in conduct that provided basis for charge of risk of injury to minor, which was general intent crime, "clearly presented the issue of whether his act, which may have caused the child to be injured, was an intended bodily movement likely to injure him," and trial court's failure "even to allude to [that] defense as one which the state had to disprove was a serious deficiency in the charge" that required new trial), cert. denied, 461 U.S. 933, 103 S. Ct. 2098, 77 L. Ed. 2d 306 (1983).

Indeed, under the facts and circumstances of the present case, the court's explanation to the jury that a person acts recklessly when he is "aware of and consciously disregards a substantial and unjustifiable risk" clearly was not an adequate substitute for an instruction on general intent because, without such an instruction, the jury could have found the defendant guilty of manslaughter in the first degree with a firearm based on the defendant's own version of events. That is, the jury could have returned a guilty verdict upon finding that

the defendant was aware of and consciously disregarded the danger posed to the victim from an *accidental discharge* of the revolver-a weapon so relatively unsafe and challenging to handle that it made the defendant nervous-occurring from a trip and fall or other mishap when the defendant, carrying the loaded revolver, entered the small, cramped bathroom while the victim was seated on the toilet.[16] Given the state's theory of the case, this eventuality would have been foreclosed by a jury instruction on general intent explaining that the defendant could not be found guilty if the revolver came into contact with the victim's head haphazardly or inadvertently, as the defendant claimed, but, rather, only if the defendant intentionally placed the gun to the victim's head. The court's charge on recklessness afforded the jury no such guidance and the defendant no such protection.

The real possibility of jury confusion because of the lack of an instruction on general intent was compounded by the prosecutor's statement, in his rebuttal closing argument, that the defendant could be found guilty whether he intentionally pressed the revolver against the victim's head "or [whether] he was handling it and tripped," as the defendant himself claimed.[17] See

---

[16] In his rebuttal closing argument, the prosecutor summarized and underscored why it was so dangerous for the defendant to enter the bathroom carrying the loaded revolver. See footnote 17 of this opinion.

[17] The entirety of the relevant portion of the prosecutor's rebuttal closing argument is as follows: "The state submits that the evidence supports no other verdict than manslaughter in the first degree with a firearm, no other conclusion [than] that he was extremely reckless that night. And that is true, frankly, regardless of which version you believe, whether he pressed the firearm up against her head forcefully or he was handling it and tripped. He was extremely reckless that night. He was evincing an extreme indifference to her life. He knew handling that gun loaded with firing caps on was very dangerous. He knew if the gun were dropped with those firing caps on, it could discharge. He knew it was a hair trigger and, yet, he's still fiddling with the firing caps, not looking where he's going, blind as a bat as he called himself, in forward motion towards the incredibly small space where [the victim] was seated when she was killed. And what happened as a result of the confluence of that extreme recklessness was the product of

footnote 7 of this opinion. Although the state's theory of the case had always been that the defendant intentionally pressed the revolver against the victim's head, the prosecutor's assertion for the first time in his rebuttal argument that the *accidental* positioning of the revolver against the victim's head also supported a guilty finding blurred the important distinction between the volitional conduct required for a guilty finding and the unintentional conduct insufficient for such a verdict. The court's instructions offered the jury no assistance in understanding or addressing this distinction, and, therefore, those instructions were inadequate to guide the jury in determining whether the elements of the offense were proven by the credible evidence adduced at trial.

"It is well established that a defendant is entitled to have the jury correctly and adequately instructed on the pertinent principles of substantive law. . . . Moreover, [i]f justice is to be done . . . it is of paramount importance that the court's instructions be clear, accurate, complete and comprehensible, particularly with respect to the essential elements of the alleged crime." (Internal quotation marks omitted.) *State* v. *Blaine*, 334 Conn. 298, 308, 221 A.3d 798 (2019). These fundamental requirements were not met in the present case because of the omission of a jury instruction on the element of general intent. As a consequence, the defendant was

this defendant's disregard for [the victim's] life at that moment.

"Ladies and gentlemen, this was no accident. Accidents are unavoidable. They're born out of circumstances that you simply cannot foresee. But the death of [the victim], that was entirely foreseeable. It was entirely avoidable. It could have been avoided if the defendant exercised reasonable judgment that night, but that is not what happened. And, sadly, [the victim] is no longer with us.

"It was the defendant's extremely reckless behavior that caused her death, and for that he should be found guilty of manslaughter in the first degree with a firearm and nothing less.

"Thank you."

deprived of a fair trial and a reliable verdict. To avoid manifest injustice, a new trial is required.

The judgment is reversed and the case is remanded for a new trial.

In this opinion the other judges concurred.